R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
Harrison E. James, Esq. (SBN:337733)
hjames@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

Christopher L. Coffin (*Pro Hac Vice Forthcoming*)
ccoffin@coffinlawllc.com
**Coffin Law, LLC**
1311 Ave. Ponce de Leon, Suite 504
San Juan, Puerto Rico 00907
Tel: (787) 961-9988

Jessica A. Reynolds (*Pro Hac Vice Forthcoming*)
jreynolds@pbclawfirm.com
**PENDLEY, BAUDIN & COFFIN, LLC**
24110 Eden Street
Plaquemine, LA 70764
Phone: (225) 687-6396
Fax: (225) 687-6398

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

JUSTIN HUNT,

                Plaintiff,

    v.

META PLATFORMS, INC. f/k/a Facebook, Inc., a corporation; GOOGLE, LLC, a limited liability company; ALPHABET INC., a corporation; H&R BLOCK INC., a corporation; and DOES 1 through 100 inclusive,

                Defendants.

**Case No.**  3:23-cv-4953

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1. **Violation of 18 U.S.C. § 1962(c) – RICO**
2. **Violation of 18 U.S.C. § 1962(d) – RICO Conspiracy**
3. **Violation of Internal Revenue Code, 26 U.S.C §§ 6103 and 7431**
4. **Violation of Federal Wiretap Act, 18 U.S.C. § 2510**
5. **Violation of California Invasion of Privacy Act ("CIPA"), California Penal Code §§ 631 And 632**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

Page

**INTRODUCTION** ........................................................................................................**4**

**PARTIES:** ...................................................................................................................**5**

**JURISDICTION AND VENUE** ................................................................................**6**

**FACTUAL BACKGROUND** ....................................................................................**7**

    I.    Meta's Process for Collecting TRI ...........................................................7

    II.   Google's TRI Collection Method ..............................................................9

    III.   Big Money in Data ...................................................................................12

    IV.   Online Tax Returns Are Big Business .....................................................14

    V.    H&R Block's Use of Pixels .....................................................................16

    VI.   H&R Block Was Not Authorized to Disclose TRI and Such Disclosure Violated

        Federal and State Laws ...........................................................................17

        A.   H&R Block is a "Tax Return Preparer" under the Federal Regulations ...............17

        B.   H&R Block Could Not Disclose Customer TRI Without Consent .......................18

        C.   H&R Block Did Not Obtain Consent to Release TRI ...............................18

    VII.  Misrepresentations Made by H&R Block Regarding Its Privacy Policies ...................19

    VIII. Misrepresentations Made by Meta Regarding Its Privacy Policies and

        Agreements with Third Parties such as H&R Block .....................................20

    IX.   Google's Misrepresentations Regarding Privacy .........................................22

    X.    The Enterprises .......................................................................................22

        A.   The Meta Enterprise ........................................................................22

    XI.   The Google Enterprise ............................................................................26

    XII.  Use of the Mails and Wires ....................................................................29

**PLAINTIFF SPECIFIC ALLEGATIONS** ............................................................**33**

**CLASS ALLEGATIONS** ........................................................................................**34**

**CAUSES OF ACTION** ............................................................................................**39**

    COUNT I: VIOLATION OF 18 U.S.C. § 1962(C) – RICO ...............................39

2

COUNT II: VIOLATION OF 18 U.S.C. § 1962(D) – RICO CONSPIRACY ...................... 41

COUNT III: VIOLATION OF INTERNAL REVENUE CODE, 26 U.S.C §§ 6103

AND 7431 ............................................................................................................... 42

COUNT IV: VIOLATION OF FEDERAL WIRETAP ACT, 18 U.S.C. § 2510 .................. 43

COUNT V: VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT

("CIPA"), CALIFORNIA PENAL CODE §§ 631 AND 632 ................................. 45

**PRAYER FOR RELIEF** .......................................................................................... **48**

**JURY TRIAL DEMAND** ........................................................................................ **49**

Plaintiff, by and through attorneys Wisner Baum, LLP, Coffin Law, LLC, and Pendley, Baudin & Coffin, LLC alleges upon information and belief:

**INTRODUCTION**

1. Protecting data privacy, especially highly sensitive personal and financial tax return information ("TRI"), is critical in today's rapidly advancing technological world. If the online collection and submission of TRI is not properly safeguarded, such personal and financial information may be intercepted, collected, recorded, or exploited for gain.

2. TRI has tangible, calculable economic value. TRI is actively sold and transmitted in an information marketplace.

3. Taxpayers also have legitimate and reasonable concerns over the privacy of their TRI.

4. TRI includes, but is not limited to, any information furnished or provided in connection with the preparation and return of taxes such as: name, social security number, address, adjusted gross income, filing status, refund amount, deductions, dependents, income properties, date of birth, health savings account contributions, education expenses, and any other information submitted in the preparation and/or filing of a return.

5. The companies who assist taxpayers in preparing and submitting their taxes through online platforms and software programs are inherently familiar with this risk and the safeguards required by law to prevent the interception, collection, recordation and/or exploitation of TRI. They are also aware of the economic value that TRI presents within the informational marketplace.

6. Due to the highly sensitive nature of TRI, the Internal Revenue Code directs that tax preparer companies may not disclose any information furnished to them, or in connection with, the preparation of a tax return, nor may a tax preparer use TRI for any purpose other than to prepare, or assist in preparing, a tax return. U.S.C. §7216(a).

7. Although tax preparers are allowed to disclose TRI to third parties under limited circumstances, for the purposes of assisting in the preparation of the tax return, the tax preparer must obtain the explicit consent of the taxpayer to do so.

8. In light of these protections, taxpayers should be able to furnish their returns and

return information to tax preparation companies like TaxAct, TaxSlayer, and H&R Block, with confidence that their privacy will be maintained.

9.      Defendants herein entered in an agreement to explicitly and intentionally violate the privacy rights, protections, and expectations of taxpayers by illegally collecting, intercepting and transmitting TRI to further the end goal of maximizing profits through direct-to-consumer advertising.   Through deceit and wire fraud, Defendants obtained economic value at the expense of the Plaintiff and the class, depriving the Plaintiff and class of tangible, economic value, through the conversion and distribution of their TRI.

### PARTIES:

10.      Plaintiff Justin Hunt ("Plaintiff" or "Mr. Hunt") is a California resident.  Mr. Hunt filed his taxes using H&R Block's online tax filing service from 2018 to 2023.  Mr. Hunt also uses Meta and Google products.

11.      Defendant Meta Platforms, Inc. f/k/a Facebook, Inc.[1] ("Meta" or "Facebook") is a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in Menlo Park, California. Meta regularly conducts business throughout the United States and in this judicial district. Meta is one of the largest technology companies in the world and conducts product development, data collection, search, and advertising operations in this district.

12.      Defendant Google, LLC ("Google") is a Delaware limited liability company with a principal place of business in Mountain View, California. Google regularly conducts business throughout the United States and in this judicial district. Google is one of the largest technology companies in the world and conducts product development, data collection, search, and advertising operations in this district.

13.      Defendant Alphabet Inc. ("Alphabet") is a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California. Alphabet is the parent holding company of Google LLC. Alphabet owns all the

---

[1] Facebook, Inc. changed its name to Meta in October 2021. This was a name change rather than creation of a separate legal entity and merger. Meta therefore *is* Facebook and successor liability is not an issue.

equity interests in Google LLC.[2]   Defendant H&R Block Inc. ("H&R Block") is a Missouri corporation, organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri. H&R Block advertises and provides, among other things, online tax preparation services to persons throughout the United States, including in this judicial district. H&R Block provides these online tax preparation services to tens of millions of consumers each year.

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which the amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a different state than Defendants.

16.    This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

17.     This Court has general personal jurisdiction over Defendants Google, Alphabet and Meta because their principal place of business is in California.

18.    This Court has personal jurisdiction over Defendant H&R Block because it has purposefully directed its marketing and sales of its tax preparation services to persons in the State of California, as well as the other consumer bases represented by this lawsuit. All Defendants have had substantial contacts with the State of California such that maintenance of the action is consistent with traditional notions of fair play and substantial justice.

19.    This Court also has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965.

20.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b). A substantial portion of the events giving rise to the claims alleged in this Complaint took place in within this

---

[2] During the 2015 reorganization, certain of Google LLC's business segments were spun off and separated into independent entities under the ownership of Alphabet. At various times during the Class Period, certain of the business segments re-merged with Google LLC under one corporate structure. Accordingly, Alphabet and Google LLC both have been named as defendants in order to ensure all corporate entities who may be found liable for any portion of the alleged wrongdoing are part of this lawsuit.

District.

21.     Venue is also proper pursuant to 18 U.S.C. § 1965.

**FACTUAL BACKGROUND**

22.     Big tech giants, such as Meta and Google, routinely track and collect consumer data pertaining to consumers' online activities.

23.     The collection of data by Meta and Google is achieved through the use of unique web codes sometimes referred to as "pixels."

24.     Pixels act as "spy cams" which operate secretly and quietly within the background of a website to collect massive amounts of user data information from the websites on which they are installed.

25.     As a consumer uses a website, these pixels begin to intercept, collect, and transmit data back to Meta and Google.

26.     Meta and Google can then use this data to better understand consumer behaviors, measure the performance of ad campaigns, and to directly target consumers with additional advertising, all for the ultimate purpose of monetizing the data.

27.     Data collected from pixels have tangible economic value.

**I.     Meta's Process for Collecting TRI**

28.     In the 21st-century digital world, we have grown accustomed to targeted advertising on our social media and internet feeds.

29.     This targeted advertising is big business and constitutes the majority of the profit margin for Meta.

30.     In 2019, Meta generated $69.7 billion from advertising, which accounted for more than 98% of its total revenue for the year.[3] In 2020, Meta had close to 86 billion in advertising revenue which accounted for around 97.9% of its total revenue.[4] In 2022, Meta generated over $116

---

[3] Iyengar, Rishi, *Here's how big Facebook's ad business really is*, CNN (July 1, 2020)
https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html
[4] Dixon, S. Meta: annual advertising revenue worldwide 2009-2022, STATISTA.COM (Feb. 13, 2023),
https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/.

COMPLAINT

1  billion in revenue with over $113 billon in advertising revenue.[5]

2      31.    Naturally, businesses want to see their advertisements on social media feeds, such as

3  those owned by Meta, and they likewise want to examine how well consumers are responding to

4  their advertisements.

5      32.    Meta advertises its "Pixel" to customers, including online tax preparation companies

6  such as TaxAct, TaxSlayer, and H&R Block, as a way to "make sure [their] ads are shown to the

7  right people," and to "drive more sales."[6]

8      33.    Upon information and belief, Meta has been utilizing its Pixel since at least 2015.

9      34.    In order to entice advertisers, like tax preparation companies, into using their Pixel,

10  Meta offers its Pixel free of charge and instructs companies on how to use it.[7]

11      35.    Meta's underlying goal is to capture, intercept, collect and transmit as much user data

12  as possible from each and every website that its Pixel is installed on.  Meta's intentions are evident

13  from its instructions which recommend that advertisers, such as tax preparation companies, install

14  the Meta Pixel on every page where they will be tracking visitor actions.[8]

15      36.    Once an advertiser, such as H&R Block, installs Meta's Pixel on its website, the

16  Pixel begins to collect information about each and every user who visits that site and the activities

17  that the user conducts on the website.  Each user is assigned a unique "c_user cookie" identifier that

18  is tracked on every website the user visits that contains a Meta Pixel.[9]

19      37.    When that same user then logs into Meta products like Facebook and/or Instagram,

20  that unique "c_user cookie" identifier is delivered to the user's computer and/or devices and delivers

21  with it a "dossier" of private information regarding the user's online activities.[10]

22      38.    Each company that installs a Meta Pixel, such as H&R Block, TaxAct and TaxSlayer,

---

[5] Dixon, S. Meta; annual revenue 2009-2022 (Apr. 19, 2023), https://www.statista.com/statistics/268604/annual-revenue-of-facebook/#:~:text=In%202022%2C%20the%20revenue%20general,in%20the%20previous%20fiscal%20year.
[6] Attacks on Tax Privacy: How the Tax Prep Industry Enabled Meta to Harvest Millions of Taxpayers' Sensitive Data, Office of Senator of Elizabeth Warren, et al., at 7 (2023) (hereinafter referred to as "Congressional Report"), available at: https://www.warren.senate.gov/imo/media/doc/Attacks%20on%20Tax%20Privacy%20Report_7.12.2023.pdf.
[7] Id.
[8] Id.
[9] Id.
[10] Id.

begins sharing consumer information with Meta.  Anytime a consumer visits a third-party domain with an embedded Meta Pixel, Meta collects a host of information regarding that consumer and their internet searches and use history.  This collection, interception, recordation, and transmission of personal information, such as TRI, occurs in real-time.[11]

39.     Although the ability to directly target a consumer with advertising depends in part on the consumer having an Instagram and/or Facebook account, operated by Meta, the Meta Pixel still gathers consumer information regardless of whether the consumer has such accounts.  Thus, all consumers who use H&R Block's online tax filing service will have their data collected, recorded, intercepted and transmitted by Meta through the use of pixels on H&R Block's website.[12]

40.     Through this data interception, collection and transmission process, Meta is able to provide its marketing partners with deep insights into the user's activities, allowing them to track visitors' actions, define custom audiences to better target ads to potential customers, and create lookalike audiences to "reach new people who are likely to be interested in [their] business because they share similar characteristics to [the business'] existing customers."[13]

41.     This data is exceptionally valuable.  This data can be used to create a dossier on individual consumers to directly target them with advertising.  Meta is able to offer this highly sought after marketing technique due in large part to its data collection practices.  Meta's revenue generated from its marketing forms the most substantial portion of revenue for Meta on an annual basis.  Therefore, TRI data is a currency of its own which may be collected and used by Meta for advertising purposes, which essentially transforms this data into cash profit for Meta.  Additionally, TRI can be directly sold in an active and competitive marketplace, where data has tangible value— with TRI being the most valuable.

## II.  Google's TRI Collection Method

42.     Much like Meta, Google offers its own pixel system known as Google Analytics ("GA"), which provides its partners the opportunity to "understand how [their] customers interact

---

[11] *Id.*
[12] *Id.*
[13] *Id.*

COMPLAINT

across [their] sites and apps," "anticipate future customer actions" with machine learning, and "optimize marketing performance."[14]

43.     The code provided by Google can be implemented without having to write additional code, which allows even less technologically sophisticated companies to utilize GA to collect certain information by default.  Google then matches that default information by geolocation to the closest city, gender, and general interests. This information is then provided to the customer for business use.[15]

44.     More sophisticated businesses, such as online tax preparation companies, are given the option to install an additional pixel, referred to as Google Tag, to collect additional information on top of the information collected by GA.[16]

45.     Essentially, Google tracks and collects consumer browsing information every time a consumer uses a webpage with GA.  When an internet user visits a webpage, such as TaxAct, TaxSlayer, or H&R Block, that uses GA, Google receives detailed personal information about that user, even if the internet user does not click on any Google-supported advertising that may appear on the website. [17]

46.     The collection, interception and transmission of this data gives Google and its employees the power to learn intimate details about individuals and makes Google a treasure trove of personal data for any government, private or criminal actor who seeks to undermine individual privacy and security.

47.     Over 70% of online websites and publishers utilize Google's GA tracking system, which Google offers to its customers for free.  Websites that choose to implement GA on their sites are provided by Google the opportunity to access data analytics regarding the consumers who traffic their website.

48.     Although GA is free to install, the associated data and attribution reports come at a price tag when the websites want more specific information.  The free reports which websites can

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at 8.

access are general reports that are supposed to contain pseudo-anonymous data regarding visitors. However, Google retains the ability to provide detailed information about visitors for a fee.

49.     When a consumer visits a website with GA, that consumer's browser begins to run both the website itself and the embedded GA code.

50.     As the GA runs, it causes the data the consumer has filled out or generated from using the website to be captured and electronically transmitted back to Google servers in California.

51.     This practice allows Google to intercept, track, and collect personal and sensitive information of consumers for its own use.

52.     After collecting, intercepting and transmitting the data, Google then transforms the method by which it is stored so that it may represent that the data is merely being aggregated. Although Google may represent that it does not exchange money in receipt for consumers' private data, Google still utilizes and/or monetizes such data.

53.     Once the data is collected, intercepted and transmitted to Google, the data belongs to Google and not the website from which it was intercepted.

54.     Therefore, Google, despite its assertions to the contrary, is not working selflessly on behalf of the websites which install Google's free GA code.  Rather, Google is working to obtain TRI data to then transform it into profit by using such data to build dossiers and even directly target consumers with advertising.

55.     Google is able to offer this highly sought after marketing technique due in large part to its data collection practices.  Google's revenue generated from its marketing forms the most substantial portion of its revenue on an annual basis.[18]  Therefore, TRI data is a currency of its own which may be collected and used by Google for advertising purposes, which essentially transforms this data into cash profit for Google.  Additionally, the TRI collected from consumers without their consent has tangible economic value and can be sold, for real economic value, in an informational

---

[18] About 80% of Google's revenue comes from advertising. *See* Ball, James, *Online Ads Are About to Get Even Worse*, THE ATLANTIC, (June 1, 2023) https://www.theatlantic.com/technology/archive/2023/06/advertising-revenue-google-meta-amazon-apple-microsoft/674258/. In 2022, Google's advertising revenue amounted to $224.47 billion dollars. *See*  Bianchi, Tiago, Google: annual advertising revenue 2001-2022, (Feb. 24, 2023), https://www.statista.com/statistics/266249/advertising-revenue-of-google/.

marketplace.

### III.   Big Money in Data

56.    Both Google and Meta leverage the endless supply of personal information data, including TRI, which they intercept and collect for their own business purposes.

57.    The more data Google and Meta are able to collect on a consumer, the more valuable that user's profile, or dossier, becomes, as it makes it easier and easier to target that user for advertising purposes.

58.    The collection of data through the use of Google's GA and Meta's Pixel has generated enormous financial success for both tech giants due to their ability to track consumers and then sell and broker in trading such information for profit.

59.    Virtually all of Google's[19] and Meta's[20] revenue is generated by and/or is attributable to their third-party advertising.

60.    Google and Meta profit by acquiring personal and sensitive consumer data such as TRI, as this type of information has substantial economic value.

61.    The value of personal data is well understood in the e-commerce industry, and personal information, such as the data contained in TRI, is now viewed as a form of currency.

62.    Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium.  The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend.  Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.

Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).  Professor Schwartz's observation has only become truer over time.

63.    Likewise, in *The Wall Street Journal*, Christopher Soghoian, Senior Advisor for Privacy & Cybersecurity for Senator Ron Wyden (and former principal technologist at the American Civil Liberties Union), noted:

---

[19] *See* n.18.
[20] *See* n.3–5.

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.

Julia Angwin, *How Much Should People Worry about the Loss of Online Privacy?*, The Wall Street Journal (No. 15, 2011).

64. Much of the value associated with personal information comes from advertising revenue. On average, internet companies in 2018 earned a conservatively estimated average of $202 per American internet user. [21]

65. In 2018, Facebook earned an average of roughly $110 in ad revenue per American user.[22]

66. Facebook earned $55.8 billion worldwide in 2018, and virtually all of it was derived from targeted advertising, which is fueled by the collection of personal information and sensitive data. When adjusted for costs, the value of Facebook users' personal information used for targeted advertising in 2018 was equivalent to $35.2 billion, or 63 percent of Facebook's total earnings.[23]

67. Likewise, Google's revenue is made up in large part from targeted advertising fueled by users' personal information.[24]

68. As software for data mining and targeting has advanced, the revenue from digital ads and marketing, and the consequent value of the data used to target such ads, has risen dramatically.[25]

69. One study found that from 2016 to 2018 the value of personal information mined by Google grew by forty percent, and the value of data mined by Meta grew eighty five percent. Based

---

[21] Shapiro, Robert, *What Your Data is Really Worth to Facebook and Why You Deserve a Cut*, The Washington Daily (July 12, 2019).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*

on these figures, the study estimated that personal information will be worth an average of $434 per American user by 2022.[26]

70.     Google and Meta are well aware of the substantial value contained within personal information such as highly sensitive TRI data.  As set forth in detail, Defendants acted together to exploit taxpayers' valuable TRI data for their own financial gain.

**IV.  Online Tax Returns Are Big Business**

71.     Online tax filing has become the predominate way that the majority of Americans file their taxes, with over 200 million Americans electing to file their returns electronically in 2022.[27]

72.     Although 80% of taxpayers elected to use an electronic return process in 2022, taxpayers are limited to a handful of private online tax preparation companies, including H&R Block.[28]

73.     On average, Americans spend $250 dollars and approximately thirteen hours each year filing their taxes online.[29]

74.     Unlike many other countries, which offer free government-run electronic tax return filing services, the United States currently does not offer such a service to American taxpayers.[30]

75.     US agencies have assessed the need and demand for a free electronic tax return filing system and believe that implementation of such a system could help tens of millions of Americans, including eleven million non-filers who missed out on $8.3 billion in refunds in 2019.[31]

76.     These free return systems, utilized by various other countries, are cheaper and easier for taxpayers, reduce errors in filing, and even cut tax fraud.[32]

77.     However, the tax preparation industry, including H&R Block, have fought against the implementation of a free tax return filing system, as the implementation of such a system would potentially devastate their very lucrative tax preparation businesses.[33]

---

[26] *Id.*
[27] Congressional Report at 4.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

78.    Specifically, H&R Block has spent more than $40 million dollars on federal lobbying since 1998 in order to preserve and enhance their business practices.[34]

79.    In addition, H&R Block helped to create a Free File program, a public-private partnership designed to provide free e-filing to over seventy percent of taxpayers.[35]  However, to date, this free file system services a mere three percent of American taxpayers.[36]  The majority of H&R Block's tax return system is still a paid service offered by H&R Block to taxpayers with the primary intent of generating profit.

80.    Unfortunately, until a direct and free e-filing system is made available, millions of Americans will be forced to continue to rely upon tax preparation companies, such as H&R Block, to complete and file their tax returns.[37]

81.    H&R Block is fully aware of the limited options which currently exist in the tax preparation market, and it has worked diligently to dominate the marketplace.  In 2022, H&R Block reported a revenue of $3.46 billion dollars.[38]

82.    H&R Block also utilized numerous nationwide television advertising campaigns to directly market its online tax return filing system to induce consumers to use it.  H&R Block, through its media campaigns, represented that its tax filing system was designed by tax experts and was easy to use.  In addition, H&R Block promoted that its tax filing system gave consumers access to live tax professionals, stating: "If you have a question or need guidance, you can chat live with a Tax Pro for help. Plus, we have checkpoints throughout the online process to see how you're doing.  If you're not sure about your work, you can choose to have a Tax Pro review your return.  Online. Without visiting an office.  That's the difference between having a website, and having an expert. And why we're not just going to get your taxes done, we're going to get your taxes won."[39]

83.    In 2021, H&R Block launched a media campaign with the theme "we make it easy

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] https://investors.hrblock.com/news-releases/news-release-details/hr-block-reports-strong-fiscal-2022-results-increases-dividend, last accessed 6/27/2023.
[39] https://www.youtube.com/watch?v=LPsP5zNtHPs

for you."  The heart of this direct-to-consumer television advertising campaign was to promote the use of H&R Block's services on cellular devices.  As portrayed in the commercial, consumers are lulled by a message of comfort and ease:  "Do your taxes virtually.  Snap a pic and leave the rest to me.  We make it easy.  Express on your phone.  You don't have to leave home.  We'll get it done right.  You can sleep well tonight.  In person or virtually, we make it easy for you."[40]

84.    H&R Block achieved its staggering, above-referenced revenue in part through its advertising practices, which included the use of Meta's Pixel and Google's GA.  In other words, H&R Block obtained value by depriving Plaintiff and the class of the tangible economic value of undisclosed TRI by transmitting that TRI to Meta and Google.

85.    All Defendants, including Meta, Google and H&R Block, were fully aware of the lucrative nature of the H&R Block's tax preparation and for-profit return filing system.

**V.   H&R Block's Use of Pixels**

86.    In response to a congressional investigation, H&R Block admitted to using Meta's Pixel for "at least a couple of years."[41]

87.    H&R Block stated that "Meta's default settings of their pixel allowed them to collect additional information, including page title information from our online tax filing service…[S]ome of those page titles included a subset of information related to the customer and his or her tax situation, including the first name of the taxpayer and aggregate amounts relating to HSA contributions, scholarships, and education expenses."[42]

88.    H&R Block also admitted that the Pixel would send information on whether taxpayers had visited pages for many categories, including dependents, certain types of income (e.g., rental or capital gains), and certain tax credits or reductions.[43]

89.    H&R Block transmitted this TRI knowingly, with the intention to profit from the fraudulent dissemination of TRI to Meta and Google.

---

[40] https://www.youtube.com/watch?v=7GDqBfbLVLg
[41] Congressional Report at 11.
[42] *Id*. at 12.
[43] *Id*.

## VI.   H&R Block Was Not Authorized to Disclose TRI and Such Disclosure Violated Federal and State Laws

### A.   H&R Block is a "Tax Return Preparer" under the Federal Regulations

90.     Companies that offer tax preparation services, such as H&R Block, are governed by the Treasury Regulations and Internal Revenue Code.

91.     Treasury Regulation 26 C.F.R. § 301.7216-1 sets forth the penalties for disclosure or use of tax return information. Section 301.7216-1(b)(2) defines a "tax return preparer" as "[a]ny person who is engaged in the business of preparing or assisting in preparing tax returns," including "[a]ny person who is engaged in the business of providing auxiliary services in connection with the preparation of tax returns, *including a person who develops software that is used to prepare or file a tax return* and any Authorized IRS e-file Provider…" Accordingly, H&R Block is a "tax return preparer" under this regulation.

92.     Pursuant to 26 C.F.R. § 7216-1(b)(3) the term "tax return information" means "any information, including, but not limited to, a taxpayer's name, address, or identifying number, which is furnished in any form or manner for, or in connection with, the preparation of a tax return of the payer." This includes information that "the taxpayer would not have furnished . . . to the tax return preparer but for the intention to engage . . . the tax return preparer to prepare the tax return."  26 C.F.R. § 301.7216-1(b)(3)(D). As such, any information a taxpayer provides to a tax preparation company, such as H&R Block, is considered TRI.

93.     "Use" of TRI is defined to include "any circumstance in which a tax return preparer refers to, or relies upon, tax return information as the basis to take or permit an action."  26 C.F.R. § 301.7216-1(b)(4).

94.     "Disclosure" of TRI is defined as the "act of making TRI known to any person in any manner whatsoever."  26 C.F.R. § 301.7216-1(b)(5).

95.     At all relevant times, H&R Block provided tax preparation services as a tax return preparer under the law.

96.     Based on the protections established under federal law, tax payers, such as Plaintiff and the putative national class members, had an expectation that their TRI data would not be

improperly collected, intercepted, and/or transmitted to third parties, such as Meta and Google, who took no part in assisting the preparation of their tax returns.

97.     H&R Block's disclosure, dissemination, transmission and/or release of Plaintiffs' and the putative class members' TRI to Meta and Google constitutes a disclosure of TRI in violation of federal regulations.

**B.      H&R Block Could Not Disclose Customer TRI Without Consent**

98.     Treasury Regulation 26 C.F.R. § 301.7216-2 describes the specific instances where a tax return preparer may disclose TRI without the consent of the taxpayer.

99.     26 C.F.R. § 301.7216.2(d) states that a tax preparer may share TRI with another tax return preparer or an auxiliary service provider. Neither Meta nor Google qualify as tax return preparers.  Nor do Meta or Google qualify as an auxiliary service provider.  H&R Block was not permitted to disclose, disseminate, transmit, and/or release customers' TRI to third party companies, including Meta and Google, without consent.

**C.      H&R Block Did Not Obtain Consent to Release TRI**

100.    Treasury Regulation 26 C.F.R. § 301.7216-3 describes specific instances where a tax return preparer may disclose or use TRI with the consent of the taxpayer.

101.    First, the tax preparer must obtain a taxpayer's written consent prior to disclosing any TRI.  26 C.F.R. § 301.7216-3(a).  The consent must be "knowing and voluntary."

102.    To disclose TRI the consent must satisfy the following requirements: (a) must include the name of the tax return preparer and the name of the taxpayer; (b) must identify the purpose of the disclosure and the intended recipients; (c) must describe the particular use authorized; (d) must specify the TRI to be disclosed; (e) must be signed and dated by the taxpayer; and (f) must specify a duration of time where it is valid, but if no duration is specified, the consent is limited to one year from the date of signing. 26 C.F.R. § 301.7216-3(a)(3)(i)(A)-(E); (b)(ii)(5).

103.    To utilize H&R Block's online services, a customer must agree to its license agreement and privacy policy, inclusive of H&R Block's Electronic Communications Consent, its Online Services Agreement, and its H&R Block Privacy Notice.

104.    H&R Block's Privacy Notice explains what kind of information about customers it

collects, as well as where it gets the information.  The notice states that H&R Block may disclose customer information as permitted by law or with customer consent to other H&R Block companies or to third parties with whom H&R Block has a written contract limiting the use or disclosure of customer information.

105.    H&R Block's notice claims that data shared for tailored advertising is made pseudonymous and that it does not share customer information with third parties for their marketing purposes without customer consent or without providing customers the opportunity to opt out of such sharing.

106.    The H&R Block Privacy Notice did not, at all relevant times, meet IRS regulatory requirements.  H&R Block did not disclose to Plaintiff or the putative class members that gathered information would include TRI.  The disclosure agreement did not list any of the recipients of customers' TRI, such as Meta and Google, nor did it list these companies as recipients of confidential TRI.  H&R Block did not obtain valid consent from Plaintiff or the putative class members prior to disclosing, disseminating, transmitting, and/or releasing TRI to third party companies such as Meta and Google.

107.    H&R Blocking knowingly concealed that TRI would be transmitted to Meta and Google.

**VII.    Misrepresentations Made by H&R Block Regarding Its Privacy Policies**

108.    H&R Block intentionally misled consumers, including Plaintiff and the putative class members, to believe that it would properly protect consumer data in accordance with the law.

109.    Specifically, H&R Block's privacy notice stated that H&R Block or a service provider acting on H&R Block's behalf would collect usage data in part to offer taxpayers "relevant information, products, or services; and enhance our [H&R Block's] products and services."[44]

110.    However, H&R Block expressly stated that it would only "disclose information as permitted by law or with your [taxpayer] consent."  Additionally, H&R Block assured taxpayers, including Plaintiff and the putative class members, that it would not disclose their TRI to third-

---

[44] Congressional Report at 33.

parties for marketing purposes without the taxpayers' express consent.[45]

111.    H&R Block attempted to circumvent the law by including vague language about disclosing taxpayer information to potential third-parties, but it deliberately concealed the scope and nature of the TRI disclosure and, clearly, failed to meet the IRS requirements for the disclosure of TRI.

112.    This is because H&R Block's privacy notice failed to list any of the recipients of TRI, including failing to identify Meta and Google.  Moreover, the notice did not give Plaintiff or the putative class members the ability to request a more limited disclosure of their tax return, as required by the regulation.

113.    H&R Block's choice of language was intentional and was designed to mislead consumers, including Plaintiff and the putative class members, into a false sense of security regarding the transmission of their TRI.  It also misrepresented the legal obligations which H&R Block was obligated to adhere to.

114.    H&R Block was fully aware that companies such as Meta and Google did not qualify as tax return preparers or an auxiliary service used for the purpose of assisting in the preparation of tax returns.[46]

115.    H&R Block failed to handle and protect Plaintiff's and the putative class members' TRI in accordance with the law, and it failed to obtain proper consent for the disclosure of TRI to Meta and Google.

## VIII.   Misrepresentations Made by Meta Regarding Its Privacy Policies and Agreements with Third Parties such as H&R Block

116.    Meta made numerous misrepresentations regarding its privacy policies.

117.    Meta claimed that developers, such as H&R Block, would not be permitted to transmit sensitive information of any kind including personal financial information.[47]  This statement was made in part to mislead consumers, including Plaintiff and the putative class

---

[45] *Id.*
[46] *Id.* at 35.
[47] *Id.* at 18.

COMPLAINT

members, into believing that Meta would not allow the transfer of sensitive information, such as TRI, while, in reality, Meta intended to intercept and utilize TRI from H&R Block for its own financial gain.

118.    Although Meta's policies make the representation that Meta seeks to prevent companies such as H&R Block from sending sensitive data to Meta, Meta does not enforce these policies, as the receipt of such data is highly valuable to Meta.  Meta takes no steps to ensure that consent has been obtained from taxpayers before it receives their sensitive data.  Instead, Meta makes its Pixel available to any company regardless of the companies' privacy policies or consent requirements.[48]

119.    Meta does not require developers such as H&R Block to read or sign any authorizations or acknowledgments regarding privacy prior to allowing them to install the Meta Pixel on their websites.

120.    Meta also makes public statements that it attempts to filter sensitive information in order to create a false sense of security for consumers and developers, but Meta's filtering system does not filter for TRI.[49]

121.    Meta even misrepresented to Congress that it provided notifications to tax preparers such as H&R Block that it was receiving sensitive TRI data a few weeks prior to the public release of a report on TRI mishandling written by the nonprofit journalism outfit, The Markup.[50]  However, when asked by Congress to produce those notifications, Meta failed to produce any proof of their existence.[51]

122.    Meta's own internal memorandum from April of 2022 reveals that Meta does not do an adequate job of ensuring data privacy.  In the document, a Meta employee writes: "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use

---

[48] *Id.*
[49] *Id.* at 19.
[50] *See* https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook, hereinafter referred to as the "Markup Report."
[51] *Id.* at 20.

X data for Y purpose.'"

123.   Meta's representations to consumers, including Plaintiff and the putative class members, about its safeguards and policies designed to prevent the transmission of sensitive personal information, such as TRI, are a ruse which misleads consumers into a false sense of security, all while Meta harvests sensitive data and then uses it for its own personal financial gain. Meta made these misleading statements even though, internally, Meta readily admitted that it could not guarantee for what purposes it might use the data it collected.

## IX.  Google's Misrepresentations Regarding Privacy

124.   Likewise, Google also made misrepresentations to consumers and companies regarding its privacy policies.

125.   Google readily represents that it will not use personal identifying information to target consumers unless they have the consumer's express consent.  Google also assures consumers and businesses that it is against their policies to use sensitive information to target advertisements.[52]

126.   However, Google does not enforce these policies, and it permits clients such as H&R Block to track any data they desire through the use of GA.  Additionally, Google admits that it never attempted to terminate H&R Block's account even though tax preparation companies were sharing TRI with Google.[53]

## X.  The Enterprises

### A.   The Meta Enterprise

127.   Defendant H&R Block entered into a contract with Meta. Part of the services provided by Meta included some programming.  This contract was entered into intentionally to create the false perception that perhaps Meta was a programmer for H&R Block's software, as such service providers may receive TRI in limited circumstances if the programmer assists with maintaining the tax prep software used for the return.  Meta's Pixel did not in any way assist with the preparation of the tax returns, as the Pixel in no way affects the functionality of the actual tax

---

[52] *Id.*
[53] *Id.*

return software and does not involve any maintenance, repair, or testing of the tax prep software.[54]

128.   Rather this contract between Meta and H&R Block was entered into in order to further the purposes of their illegal enterprise which was designed to fraudulently intercept, collect and transmit Plaintiff's and the putative class members' sensitive TRI data to Meta for the purposes of generating highly lucrative, individually-targeted advertisements, and to enhance H&R Block's advertising and services.

129.   By way of this contract, Meta and H&R Block formed a legal association in accordance with 18 U.S.C.§1961(4).

130.   Furthermore, Defendants Meta and H&R Block entered an agreement to commit two or more predicate acts, and conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C.§1962(d).   The actions of Defendants were in furtherance of the enterprise in violation of 18 U.S.C.§1962(d).

131.   Meta and H&R Block formed an association in fact enterprise, even though they did not form a legal entity, for the purposes of intercepting, collecting, recording and transmitting Plaintiff's and the putative class members' highly sensitive TRI information using H&R Block's electronic tax preparation services.

132.   H&R Block, as a tax preparer, was well aware that the interception, collection, recordation and transmission of Plaintiff's and the putative class members' highly sensitive TRI to a third-party such as Meta was illegal.   Despite this knowledge, H&R Block willingly installed Meta's Pixel onto its website for the express purpose of allowing Meta to gather Plaintiff's and the putative class members' sensitive TRI information while providing H&R Block with the benefit of insight into its consumer traffic and advertising.

133.   Meta made clear that its intent in having H&R Block install its Meta Pixel was to intercept, collect, record, and transmit personal information for Meta's own use as well.

134.   The use of Meta's Pixel was coordinated.   Meta supplied the Pixel free of charge to H&R Block and instructed H&R Block on how to install the Pixel on its website pages for the

[54] *Id*. at 35-36.

purposes of collecting Plaintiff's and the putative class members' consumer data including TRI data.

135.   Once the Meta Pixel was installed by H&R Block on its website, Meta began to receive TRI in real-time as Plaintiff's and the putative class members' filled out their online electronic returns.

136.   At no point in time did Meta or H&R Block willingly reveal to Plaintiff and the putative class members that Meta's Pixel was hidden on H&R Block's website and was secretly intercepting, recording, collecting and transmitting Plaintiff's and the putative class members' TRI from H&R Block to Meta.

137.   This symbiotic relationship between H&R Block and Meta came into existence at least by 2015 and lasted through at least 2022.

138.   During this time period, H&R Block and Meta worked together in a coordinated pattern of effort to intercept, collect, and transmit Plaintiff's and the putative class members' TRI in order to harvest valuable consumer data that could later be monetized into tangible advertising dollars.

139.   At no time did H&R Block or Meta reveal to Plaintiff and the putative class members that their TRI was being intercepted and transmitted to Meta.  Nor did H&R Block or Meta reveal to Plaintiff and the putative class members the purpose for which their TRI was being transmitted to Meta: for tremendous profits generated by the collection of such data for use in marketing.

140.   H&R Block and Meta are two separate and distinct business entities who colluded together to create this pattern of coordinated racketeering activity to enhance their bottom lines through the interception and transmission of Plaintiff's and the putative class members' highly private and protected TRI.

141.   The purpose of this enterprise was to make money from the transmission and use of the Plaintiff's and the putative class members' TRI—H&R Block by using the TRI collected and reported by Meta to target consumers for their products, and Meta by profiting from the tangible value of TRI as part of its advertising and marketing machine.  All parties to the enterprise obtained value through their fraudulent conversion and transmission of Plaintiff's and the putative class members' TRI.

142.    H&R Block furthered the purpose of this enterprise by willingly installing Meta's Pixel on its website pages, allowing Meta to intercept, collect, record, and transmit TRI in contravention of the law prohibiting the disclosure of TRI to third parties such as Meta.

143.    In exchange for installing Meta's Pixel on its website, H&R Block obtained the benefit of Meta's analysis of customer traffic on its webpage and the option to gain access to important data to continue to drive H&R Block's profit margins through the acquisition of additional customers.

144.    Although Meta did not exchange money for the interception, collection, recordation, and transmission of TRI from H&R Block, Meta understood that the collection of such data translates in the world of e-commerce to significant monetary value, as it allows Meta to offer highly targeted advertising practices to businesses, which makes up the majority of Meta's sizeable revenue.  Without Meta's superpower of harvesting massive amounts of data to tailor advertising efforts for its business customers, Meta would not be the exceptionally wealthy and powerful company that it is.

145.    These actions demonstrate that Meta and H&R Block associated with one another to engage in a common course of conduct with a shared and common purpose of profiting from the transmission and use of the Plaintiff's and the putative class members' TRI.

146.    The Enterprise between Meta and H&R Block involved ongoing organization between these Defendants, with each party having specific and co-dependent roles in its ongoing activities.  H&R Block provided the platform to secretly collect sensitive TRI, and Meta provided the software and code (Pixel) to fraudulently ensure the TRI's transmission and use by the Enterprise.  This ongoing enterprise continued from 2015 through 2022.

147.    H&R Block and Meta shared in the benefits of the fraudulently transmitted TRI in that H&R Block could utilize the TRI to better target customers and provide additional services through advertising.  Meta obtained a benefit by collecting the TRI transmitted by H&R Block which Meta could then use for its own purposes including financial gain through targeted advertising.

\\

**XI.  The Google Enterprise**

148.    Upon information and belief, H&R Block entered into an account with Google as part of Google Analytics.  This account was intentionally established to analyze customer activities, including those of Plaintiff and the putative class members, on H&R Block's site.  However, Google's GA in no way assisted in the preparation of tax returns.

149.    Rather, this account established between H&R Block and Google was entered into and designed to further the purposes of their illegal enterprise to fraudulently intercept, collect and transmit Plaintiff's and the putative class members' sensitive TRI data to Google for the purposes of generating highly lucrative targeted advertisements and to enhance H&R Block's advertising and consumer services.

150.    By way of this contract, Google and H&R Block formed a legal association in accordance with 18 U.S.C. §1961(4).

151.    Defendants Google and H&R Block entered an agreement to commit two or more predicate acts and conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C.§1962(d).  The actions of Defendants were in furtherance of the enterprise in violation of 18 U.S.C.§1962(d).

152.    Google and H&R Block formed an association in fact enterprise, even though they did not form a legal entity, for the purposes of intercepting, collecting, recording, and transmitting Plaintiff's and the putative class members' highly sensitive TRI information from taxpayers using H&R Block's electronic tax preparation services to Google.

153.    H&R Block, as a tax preparer, was well aware that the interception, collection, recordation and transmission of Plaintiff's and the putative class members' highly sensitive TRI to a third-party such as Google was illegal.

154.    Despite this knowledge, H&R Block willingly installed Google's GA onto its website for the express purpose of allowing Google to gather Plaintiff's and the putative class members' sensitive TRI information while providing H&R Block with the benefit of Google analytics that would aid with targeted advertising.

155.    Google made clear that H&R Block could install its Google GA to intercept, collect,

COMPLAINT

record, and transmit personal information to create data useful in targeted advertising.

156.    The use of Google's GA was coordinated.  Google supplied the GA code free of charge to H&R Block and instructed H&R Block on how to install GA on its website pages for the purposes of collecting Plaintiff's and the putative class members' consumer data, including TRI data.

157.    At no point in time did Google or H&R Block willingly reveal to Plaintiff or the putative class members that Google's GA was hidden on H&R Block's website and was secretly intercepting, recording, collecting, and transmitting Plaintiff's and the putative class members' TRI.

158.    During the time period in which H&R Block had Google's GA installed on its website, H&R Block and Google worked together in a coordinated pattern of effort to intercept, collect, and transmit Plaintiff's and the putative class members' TRI in order to harvest valuable consumer data that could later be monetized into tangible revenue from advertising.

159.    At no time did H&R Block or Google reveal to Plaintiff and the putative class members that their TRI was being intercepted and transmitted to Google.  Nor did H&R Block or Google reveal to Plaintiff and the putative class members the purpose for which their TRI was being transmitted to Google—for tremendous profits generated by the collection of such data for use in marketing.

160.    H&R Block and Google are two separate and distinct business entities who colluded together to create this pattern of coordinated racketeering activity to enhance their bottom lines through the interception and transmission of Plaintiff's and the putative class members' highly private and protected TRI.

161.    The purpose of this enterprise was to make money from the transmission and use of the Plaintiff's and the putative class members' TRI—H&R Block by using the TRI collected and reported by GA to target consumers for their products, and Google by profiting from the tangible value of TRI as a part of its advertising and marketing machines. All parties to the enterprise obtained value through their fraudulent conversion and transmission of Plaintiff's and the putative class members' TRI.

162.    H&R Block furthered the purpose of this enterprise by willingly installing Google's

GA on its website pages and allowing Google to intercept, collect, record, and transmit Plaintiff's and the putative class members' TRI in contravention of the law prohibiting the disclosure of TRI to third parties such as Google.

163.   In exchange for installing Google's GA on its website, H&R Block obtained the benefit of Google's analysis of customer traffic on its webpage and the option to gain access to important data to continue to drive H&R Block's profit margins through the acquisition of additional customers and creating targeted advertisements.

164.   Although Google did not exchange money for the interception, collection, recordation, and transmission of TRI from H&R Block, Google understood that the collection of such data translates in the world of e-commerce to significant monetary value, as it allows Google to offer highly targeted advertising practices to businesses, which makes up the majority of Google's sizeable revenue.   Without Google's superpower of harvesting massive amounts of data to tailor advertising efforts for its business customers, Google would not be the exceptionally wealthy and powerful company that it is.

165.   These actions demonstrate that Google and H&R Block associated with one another to engage in a common course of conduct with a shared and common purpose of profiting from the transmission and use of Plaintiff's and the putative class members' TRI.

166.   The Enterprise between Google and H&R Block involved ongoing organization between these Defendants, with each party having specific and co-dependent roles in its ongoing activities.   H&R Block provided the platform to secretly collect sensitive TRI, and Google provided the software and code (GA pixel) to fraudulently ensure the TRI's transmission and use by the Enterprise.   This ongoing enterprise continued during the time period H&R Block had the Meta Pixel and/or Google Analytics installed on its websites, which continued for years.

167.   These coordinated and ongoing activities persisted for a substantial number of years. Throughout this time, Google and H&R Block engaged in a common course of conduct with a shared and common purpose of profiting from the transmission and use of the Plaintiff's and putative class members' TRI.

168.   H&R Block and Google shared in the benefits of the fraudulently transmitted TRI in

28
COMPLAINT

that H&R Block could select to track specific portions of TRI to better target customers and provide additional services through advertising.  Google obtained a benefit by collecting the TRI transmitted by H&R Block which Google could then use for its own purposes, including financial gain through targeted advertising.

## XII.   Use of the Mails and Wires

169.   Defendants used thousands of interstate wire communications in order to organize, create, develop, monitor, and manage their fraudulent scheme.   The scheme involved the interception, collection, recordation and interstate transmission of taxpayer TRI from across the nation for the purpose of utilizing such data to obtain substantial financial revenue through Meta and Google's advertising practices.

170.   Defendants use of the mails and wires to perpetrate their fraudulent enterprise involved thousands of interstate communications via the internet during the time period H&R Block had the Meta Pixel and/or Google Analytics installed on its websites.

171.   Defendants began to perpetrate their scheme through the use of mails and wires on multiple fronts.

172.   The mails and wires were used to transmit fraudulent communications to Plaintiff and the putative class members regarding H&R Block's privacy and data security policy which intentionally concealed that H&R Block was fraudulently transmitting Plaintiff's and the putative class members' TRI to both Google and Meta.

173.   The mails and wires were used to fraudulently misrepresent to Plaintiff and the putative class members that H&R Block had the authority to transmit TRI to third parties in direct contravention of the tax regulations which H&R Block was required to comply with.  At no time did H&R Block disclose to Plaintiff and the putative class members that their TRI would be transmitted to Meta and/or Google.

174.   The mails and wires were used to fraudulently represent that H&R Block would not engage in the sharing of Plaintiff's and the putative class members' TRI in contravention of the law, during the course and existence of the enterprises between H&R Block, Meta and Google despite the Defendants knowingly intending to violate the law which precluded the sharing of Plaintiff's

and the putative class members' TRI.

175.    The mails and wires were used to make misrepresentations on the parts of both Meta and Google to intentionally mislead Plaintiff and the putative class members to believe that Meta and Google did not engage in practices which would allow for the interception or collection of Plaintiff's and the putative class members' personal and sensitive information such as TRI.   Meta and Google both represented that they would not permit sensitive personal information, such as TRI, to be transmitted by a company, such as H&R Block, and that if such a transmission would take place the Plaintiff and the putative class members must give express permission.

176.    The mails and wires were used by all Defendants in their privacy policies to misrepresent that they would not collect Plaintiff's and the putative class members' sensitive data which could be used to identify Plaintiff and the putative class members because the transmission of any TRI would be anonymous.[55]

177.    The mails and wires were used by H&R Block to orchestrate a nationwide advertising campaign to promote and induce consumers into utilizing H&R Block's online and cellular phone tax preparation and filing system.  Specifically, H&R Block promoted "we make it [tax return prep and filing] easy for you" through the use of its online services.  In addition, H&R Block represented that it provided "checkpoints" to see how consumers were doing while completing their tax returns, but H&R Block never disclosed that both Meta and Google were also keeping an eye on and checking in on consumers' TRI.  Rather, H&R Block misrepresented in its nationwide advertising campaigns that its online services were designed by tax professionals who were ready to help, and that the use of their online services were just as secure filing a return in a brick and mortar location. H&R Block engaged in these advertisements to create the false perception for Plaintiff and the putative class members' that their status as a tax preparer carried with it the assurances that H&R Block was professional and therefore not actively violating the law by sharing Plaintiff's and the putative class members' TRI.

178.    These misrepresentations were intentional and were expressly intended to induce

---

[55] *Id*. at 20.

consumers, such as Plaintiff and the putative class members, into believing that their TRI was properly protected from disclosure to entities such as Meta and Google who should not receive such information under any circumstance.

179.     With these fraudulent representations in place, Defendants used the mails and wires to put their scheme into action.

180.     The mails and wires were used by Google and Meta to create codes which were designed to intercept, collect, record, and fraudulently transmit Plaintiff's and the putative class members' TRI.

181.     The mails and wires were used to facilitate communications between H&R Block, Google and Meta.  Both Meta and Google provided H&R Block with instructions as to how to install and secretly embed Google's GA and Meta's Pixel onto H&R Block's website without making the use of such code known to Plaintiff and the putative class members.

182.     H&R Block used the mails and wires to embed both Meta's Pixel and Google's GA into their website.

183.     The mails and wires were used to transmit Plaintiff's and the putative class members' TRI between H&R Block and Google and between H&R Block and Meta under the cover of darkness, as Plaintiff and the putative class members were not made aware that their personal and sensitive TRI was being intercepted, collected, and transmitted by H&R Block to both Google and Meta.

184.     Once Meta's Pixel was embedded into H&R Block's website, H&R Block began intercepting, collecting, and electronically transmitting the TRI of Plaintiff and the putative class members to Meta in real-time to and from locations across the United States.

185.     Once Google's GA was embedded into H&R Block's website, H&R Block began intercepting, collecting, and electronically transmitting the TRI of Plaintiff and the putative class members to Google in real-time to and from locations across the United States.

186.     Upon intercepting this TRI from H&R Block, Meta used the mails and wires to record this data and store it on its servers to be used for Meta's own purposes, including but not limited to being used for targeted advertising, which translated into substantial revenue for Meta.

187.    Likewise, upon intercepting this TRI from H&R Block, Google used the mails and wires to record this data and store it on its servers to be used for Google's own purposes, including but not limited to being used for targeted advertising, which translated into substantial revenue for Google.

188.    The mails and wires were used to transmit fraudulently obtained TRI from H&R Block to Google and Meta to further the enterprises' purposes of profiting from the transmission and use of the Plaintiff's and the putative class members' TRI.

189.    The mails and wires were used by Meta and Google to collect TRI on Plaintiff and the putative class members which could then be monetized by using that fraudulently collected TRI through the use of mails and wires to target ads back to Plaintiff and the putative class members.[56]

190.    Defendants maintained and renewed their privacy statements through the mails and wires on an annual basis during the existence of the enterprises to continue, in an ongoing manner, to misrepresent to consumers, including Plaintiff and the putative class members, that their TRI data was safe and secure.

191.    These statements transmitted through mails and wires were made with full knowledge that Defendants were actively engaged in the fraudulent sharing of TRI data.

192.    Google and Meta continue to use mails and wires to store the TRI data collected from H&R Block on their servers.

193.    Once the Markup Report exposed the fraudulent actions of Defendants, Defendants used the mails and wires to communicate about the content of the report.

194.    The publication of the Markup Report led to a Congressional investigation into the activities of Defendants.

195.    The mails and wires were used by Defendants to misrepresent to Congress that H&R Block's use of Meta's Pixel and Google's GA were "common industry practices" and therefore not in violation of any duty or law protecting or shielding TRI.[57]

196.    The mails and wires were used by Defendants to misrepresent to Congress that the

---

[56] *Id*. at 2.
[57] *Id*. at 2, 10.

COMPLAINT

TRI intercepted, recorded, collected, and transmitted was done anonymously even though such TRI data was easily used to target taxpayers and could be easily used to identify individuals. As the Congressional investigation revealed, all Defendants misrepresented that because the TRI was "hashed," it was therefore anonymous, a statement which was found not to hold up.[58]

197.   H&R Block used the mails and wires to misrepresent to Congress that it did not use Google's GA on its website, even though Google confirmed that H&R Block did in fact have Google's GA code installed on its website.[59]

198.   The mails and wires were used by Meta to misrepresent to Congress that any sensitive TRI information transmitted by H&R Block would have been filtered out.[60]

**PLAINTIFF SPECIFIC ALLEGATIONS**

199.   Plaintiff Justin Hunt is a United States taxpayer who utilized H&R Block's online tax preparation website and services to compile and prepare his tax returns from approximately 2018 to 2023.

200.   Plaintiff resides in Stevenson Ranch, California, and filed his returns from that location.

201.   As a taxpayer, Plaintiff has a reasonable expectation based upon applicable law and the representations made by Defendants that his TRI data would not be fraudulently intercepted, collected and transmitted from his tax preparer, H&R Block, to Meta and Google.

202.   Plaintiff used the services of H&R Block to prepare his taxes with the expectation that his TRI information would be protected from disclosure from third parties such as Meta and Google.

203.   Had Plaintiff been aware of the enterprise and scheme perpetrated by Defendants he would not have used H&R Block to prepare his taxes.

204.   Additionally, Plaintiff likewise understands that his sensitive TRI information is exceptionally valuable, as it can be used to fuel online advertising by Meta and Google.

---

[58] *Id*. at 2, 13.
[59] *Id*. at 11.
[60] *Id*. at 19-20.

205.    By transmitting Plaintiff's TRI to Meta and Google, the Defendants deprived Plaintiff of actual economic value by converting his otherwise valuable TRI to disclosed TRI.

206.    Plaintiff received no benefit from the fraudulent transmission of his TRI information. Rather, Defendants received highly valuable data from Plaintiff for free through their fraudulent scheme to intercept, collect and transmit Plaintiff's TRI data.

207.    Defendants fraudulently obtained Plaintiff's TRI data and used it for their own financial gain to the detriment of Plaintiff.

208.    Plaintiff lost the monetary value of his sensitive TRI data when it was fraudulently intercepted, recorded and transmitted by Defendants.

209.    Defendants' conduct was the proximate cause of Plaintiff's injuries and was directly related to the Defendants actions.

210.    Defendants' misrepresentations and omissions regarding the handling and transmission of TRI foreseeably caused Plaintiff to utilize H&R Block's tax preparation software to prepare his taxes with the belief that his personal TRI data would not be intercepted, recorded, and transmitted to Meta and Google to then be transformed into monetary value through the use of targeted advertising.

211.    Plaintiff, during the time period he was using H&R Block to prepare his taxes, did not read or see any information regarding H&R Block sharing his TRI data with Meta and/or Google.

212.    Plaintiff had no reason to believe he was the victim of consumer protection violations, tax code violations, RICO violations, or that his TRI data was being fraudulently intercepted, collected and transmitted.

213.    Had Plaintiff known that H&R Block was sharing his highly sensitive TRI data with Meta and Google, Plaintiff would have never purchased or paid for H&R Block's tax preparation services.

## CLASS ALLEGATIONS

214.    This matter is brought as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of consumers throughout the United States.

215.   As discussed at length in this complaint, Defendants have engaged in a comprehensive program to mislead consumers and fraudulently share sensitive TRI for Defendants' own financial gain.   Class action law has long recognized that, when a company engages in misconduct that has uniformly harmed a large number of claimants such as Plaintiff and the putative class members he seeks to represent, class resolution can be an effective tool to redress the harm. This complaint is, thus, well suited for class-wide resolution.

216.   Defendants' deceptive and misleading scheme was calculated to extract valuable TRI from unwitting taxpayers on a massive scale.   This TRI was, in turn, used to improve Defendants' targeted advertising operations, a revenue-generator for all Defendants.

217.   The proposed National Class is defined as:

> All persons in the United States and its territories who submitted personal information to H&R Block for the purpose of online tax return preparation during the time the Meta Pixel and/or Google Analytics existed on the H&R Block websites.   Excluded from the National Class are employees of Defendants, including their officers and directors and the Court to which this case is assigned.

218.   The putative National Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

    a.   Numerosity: Millions of Americans, throughout the United States and associated territories, used H&R Block to file and prepare their tax returns during the time period H&R Block had the Meta Pixel and/or Google Analytics installed on its websites.

    b.   Commonality: Questions of law and fact are common to all members of the putative Class.   Specifically, Defendants' misconduct was directed at all members of the Class.   Thus, all members of the Class have common questions of fact and law, including:

        i.   whether Defendants engaged in a common course of conduct as an enterprise with the common purpose to profit from the illegal transmission and use of Plaintiff's and putative class members' TRI;

ii.  whether Defendants fraudulently intercepted the contents of electronic communications containing sensitive TRI in violation of federal anti-wiretapping laws;

iii.  whether Defendants intercepted class members' TRI without the proper consent and/or knowledge of the class members;

iv.  whether Defendants violated Internal Revenue Codes 26 U.S.C §§ 6103 and 7431 by transmitting TRI to third-parties without taxpayer consent;

v.  whether Plaintiff and putative class members had a reasonable expectation that their TRI would not be fraudulently intercepted, collected and transmitted from their tax preparer, H&R Block, to undisclosed third parties such as Meta and Google;

vi.  whether Plaintiff and the putative class are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

vii.  whether Plaintiff and the putative class members have sustained damages as a result of Defendants' conduct, and if so, gauging the appropriate measures of damages and/or restitution.

c.  Typicality: Plaintiff's claims are typical of the claims of the members of the putative Class because his claims arise from the same course of conduct by Defendants, i.e., false, misleading, and deceptive marketing and a racketeering conspiracy.  Plaintiff and putative class members prepared and submitted their TRI to H&R Block through H&R Block's online platform without any knowledge that their sensitive TRI was illegally transmitted, intercepted, and collected by Google and Meta.

d.  Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class since his interests in vindicating his own claims are shared with all members.  In addition, Plaintiff is represented by attorneys who are competent and experienced in both consumer protection and class action litigation.

219.  The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior.  Pursuant to Rule 23(b)(3), common issues

of law and fact predominate over any questions affecting only individual members of the putative class. Defendants deliberately engaged in a widespread campaign to mislead consumers into believing that their TRI would not be improperly shared for financial gain. Proceeding with this class action is superior to other methods for fair and efficient adjudication of this controversy, because, *inter alia*;

    a. Individual joinder of the individual members is wholly impracticable;

    b. The economic damages suffered by the individual members may be relatively modest compared to the expense and burden of individual litigation;

    c. The court system would benefit from a class action because individual litigation would overload court dockets and magnify the expense to all parties; and

    d. The class action device presents far fewer management difficulties and provides the benefit of comprehensive supervision by a single court with economies of scale.

220.    The proposed California Class is defined as:

All persons in California who submitted personal information to H&R Block for the purpose of online tax return preparation during the time the Meta Pixel and/or Google Analytics existed on the H&R Block websites. Excluded from the California Class are employees of Defendants, including their officers and directors and the Court to which this case is assigned.

221.    The putative California Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

    a. Numerosity: Thousands of California residents used H&R Block's online services and platform to prepare and file their tax returns during the time period H&R Block had the Meta Pixel and/or Google Analytics installed on its websites.

    b. Commonality: Questions of law and fact are common to all members of the putative Class. Specifically, Defendants' misconduct was directed at all members of the Class. Thus, all members of the Class have common questions of fact and law, including:

        i. whether Defendants violated California's Invasion of Privacy Act;

ii.  whether Defendants used new technologies such as computers, the Internet, and email to willfully and without consent of all parties to the communications tap the internet communications and contents to learn of Plaintiff's and the putative class members' TRI through the use of pixels;

iii.  whether Google's GA and Meta's Pixel constitute devices designed for eavesdropping;

iv.  whether Plaintiff and the putative class are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

v.  whether Plaintiff and the putative class members have sustained damages as a result of Defendants' conduct, and if so, gauging the appropriate measures of damages and/or restitution.

c.  Typicality: Plaintiff's claims are typical of the claims of the members of the putative Class because his claims arise from the same course of conduct by Defendants, i.e., utilizing pixels as eavesdropping devices designed to intercept, read, and transmit Plaintiff's and the putative class members' TRI without their consent.

d.  Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class since his interests in vindicating his own claims are shared with all members.  In addition, Plaintiff is represented by attorneys who are competent and experienced in both consumer protection and class action litigation.

222.  The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior.  Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the putative class.  Defendants deliberately engaged in violations of the California Consumer Privacy Act.  Proceeding with this class action is superior to other methods for fair and efficient adjudication of this controversy, because, *inter alia*;

a.  Individual joinder of the individual members is wholly impracticable;

b.  The economic damages suffered by the individual members may be relatively modest compared to the expense and burden of individual litigation;

c.  The court system would benefit from a class action because individual litigation would overload court dockets and magnify the expense to all parties; and

d.  The class action device presents far fewer management difficulties and provides the benefit of comprehensive supervision by a single court with economies of scale.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF 18 U.S.C. § 1962(C) – RICO

223.    Plaintiff, individually, and on behalf of the putative National Class, incorporates the foregoing allegations as if fully set forth herein.

224.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this complaint in violation of 18 U.S.C. § 1962(c).

225.    The aforementioned Meta and Google Enterprises are associations-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants.  All entities are persons within the meaning of 18 U.S.C. § 1961(3) and acted to enable Defendants to fraudulently obtain TRI for their own financial gain.

226.    The enterprises functioned as ongoing organizations and continuing units.  The enterprises were created and/or used as tools to effectuate a pattern of racketeering activity.  Each of the Defendants is a "person" distinct from the enterprises.

227.    Defendants created and maintained systematic links for a common purpose: collecting TRI to increase Defendants' revenues and profits through enhanced targeted advertising. Accordingly, each Defendant in the enterprises benefited from the existence of the other Defendant.

228.    Defendants established the enterprises to accomplish goals that were instrumental to their scheme to fraudulently obtain TRI data for their own financial gain in their marketing and advertising businesses.  They accomplished that end by concealing from consumers that H&R Block was sharing sensitive TRI with Meta and Google.

229.    The enterprises engaged in and affected interstate commerce, because, *inter alia*, H&R Block provided tax preparation to millions of taxpayers throughout the United States whose private TRI data could be harvested from and then utilized by Google and Meta for continued

financial gain.  The fraudulent interception, collection and transmission of TRI occurred through the use of wires throughout the United States and its associated territories.

230.    Defendants exerted control over the enterprises and have participated in the operation or management of the affairs of the enterprises in coordination with one another.

231.    As detailed herein, Defendants' pattern of racketeering activity includes acts indictable as wire and/or mail fraud under 18 U.S.C. § 1343.  Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting the privacy and sharing of TRI data; (b) intentionally concealing from consumers that their TRI data was being shared with Meta and Google; (c) intentional interception, collection and transmission of TRI from H&R Block to Google and Meta; (d) actively concealing the presence of Meta's Pixel and Google's GA on H&R Block's tax preparation website; and (e) misrepresenting and concealing the ties between Defendants.

232.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depend on the honesty and integrity of Defendants in representing the sharing of TRI data. The members of the Class also rely on federal law prohibiting the sharing of TRI with third parties, such as Meta and Google, who do not participate in the preparation of tax returns.

233.    At all times during the fraudulent scheme, Defendants had a legal and ethical obligation of candor to, and honest dealing with, persons using H&R Block's tax preparation services, including Plaintiff and the putative class members.

234.    The conduct of the enterprises described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Defendants chose to conduct activities and transactions in such a manner that constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

235.    The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiff and the putative class members.  Defendants knew that by concealing their involvement with one another—e.g., the existence of Meta's Pixel and Google's AG code embedded on H&R Block—that Defendants could acquire and share TRI in contravention of the law for Defendants' own financial gains.

COMPLAINT

236.    Defendants' motive in creating and operating the fraudulent scheme and the enterprises was to obtain additional revenues and profit by using taxpayer TRI data, including Plaintiff's and the putative class members' data, to enhance Defendants' abilities to target their advertising efforts for financial gain.

237.    Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff's and class members' TRI was shared without any compensation to Plaintiff and that Plaintiff paid H&R Block to use H&R Block's tax preparation services without knowledge that Defendants were harvesting Plaintiff's and class members' TRI data for substantial financial gain.

238.    The injuries to Plaintiff and class members were directly and proximately caused by Defendants' racketeering activities.  In the absence of Defendants' improper conduct, Plaintiff and the class members would not have been deprived of material information about the sharing and use of their TRI data and would not have been injured by the fraudulent collection of such data.

239.    Because of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and the putative class for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

240.    By reason of the foregoing, and a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and members of the putative class have suffered damages.  Plaintiff and members of the putative class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**COUNT II: VIOLATION OF 18 U.S.C. § 1962(D) – RICO CONSPIRACY**

241.    Plaintiff, individually, and on behalf of the putative National Class, incorporates the foregoing allegations as if fully set forth herein.

242.    Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

243.    Defendants violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise described previously through a pattern of racketeering activity.  Defendants

conspired to fraudulently obtain and share TRI for their own financial gain.

244.     Defendants engaged in numerous overt and predicate fraudulent racketeering acts and omissions in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and Class of money and property.

245.     As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), as described herein, Plaintiff and the members of the Class have been injured in their property as set forth more fully above.

246.     Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts discussed extensively herein, including but not limited to:

   a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

   b.   Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

   c.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

247.     Because these violations of 18 U.S.C. §1962(d), Defendants are liable to Plaintiffs and the members of the putative class for three times the damages Plaintiff and the class members sustained, plus the cost of this suit, including reasonable attorney's fees.

248.     By reason of the foregoing, and a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff and members of the putative class have suffered damages. Plaintiff and members of the putative class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**COUNT III: VIOLATION OF INTERNAL REVENUE CODE, 26 U.S.C §§ 6103 AND 7431**

249.     Plaintiff, individually, and on behalf of the putative National Class, incorporates the foregoing allegations as if fully set forth herein.

250.     26 U.S.C. § 6103(a) provides that "returns and return information shall be confidential except where authorized by this title."

251.     "Return" is defined as "any tax or information return, declaration of estimated tax, or claim for refund…and any amendment or supplement thereto, including supporting schedules,

attachments, or lists which are supplemental to, or part of, the return so filed." 26 U.S.C. § 6103(b)(1).

252.    "Return information" means "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments…" 26 U.S.C. § 6103(b)(2).

253.    26 U.S.C. § 7431(a)(2) provides that "if any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 or in violation of 6104(c), such taxpayer may bring a civil action for damages against such person in a district court of the United States."

254.    Defendants are not an officer or employee of the United States.

255.    At all relevant times, H&R Block maintained and operated online tax preparation software through https://hrblock.com and mobile platforms for the purpose of electronic tax filing. Plaintiff and the putative class members utilized H&R Block's online tax preparation software to prepare and file federal and state income tax returns.

256.    At all relevant times, H&R Block's online tax preparation software and mobile platforms contained Meta Pixels and Google Analytics that disclosed, disseminated, transmitted, and/or released Plaintiff's and putative class members' TRI to Meta and Google.

257.    H&R Block violated 26 U.S.C. § 6103, by either knowingly or by reason of negligence, disclosing return information about Plaintiff and the putative class members to Meta and Google.

258.    Meta and Google violated 26 U.S.C. § 6103, by either knowingly or by reason of negligence, inspecting return information about Plaintiff and the putative class members.

259.    Plaintiff, individually, and on behalf of the putative class seeks all relevant damages as set forth in 26 U.S.C. § 7431(c).

**COUNT IV: VIOLATION OF FEDERAL WIRETAP ACT, 18 U.S.C. § 2510**

260.    Plaintiff, individually, and on behalf of the putative National Class, incorporates the foregoing allegations as if fully set forth herein.

261.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device, 18 U.S.C. § 2511.

262.    The Wiretap Act protects both the sending and receipt of communications.

263.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral or electronic communication is intercepted.

264.    Defendants' actions in intercepting, collecting and transmitting sensitive TRI data from consumers who utilized H&R Block's website to prepare their taxes was intentional. H&R Block, Google and Meta are all aware that they intercepted, recorded and transmitted TRI data in contravention of the law.

265.    Defendants intercepted this TRI data in real time by having H&R Block install Meta's Pixel and Google's AG onto H&R Block's tax preparation website.

266.    The communications intercepted by Google and Meta included "contents" of electronic communications made by taxpayers on H&R Block's website in the preparation of their tax returns.  Such TRI data was protected by law from disclosure to third parties not involved in the preparation of tax returns, such as Google and Meta.

267.    This TRI data was intercepted without the consent of Plaintiff and the putative class members and were transmitted electronically by wire from H&R Block's website to Meta and Google.

268.    The following constitute "devices" within the meaning of 18 US.C. § 2510(5):

   a.  The computer codes and Pixels written and created by Google and Meta to intercept and collect Plaintiff's communications and TRI data from H&R Block;

   b.  Plaintiff's mobile and computing devices;

   c.  H&R Block's website, Google's web and ad servers and Meta's web and ad servers; and

   d.  The plan Google and Meta carried out to effectuate their tracking and interception of Plaintiff's communications.

269.    Google and Meta were not authorized parties to the communications between

1   Plaintiff and H&R Block in the preparation of Plaintiff's tax return, and Plaintiff was unaware of

2   Google and Meta intercepting and using his TRI data for their own financial gain.

3        270.    As illustrated herein, "the" communications between Plaintiff and H&R Block were

4   simultaneous to, but separate from, the transmission of Plaintiff's TRI data to Google and Meta.

5   Plaintiff did not consent to the collection of his TRI and its transmission to Meta and Google.

6        271.    After intercepting the communications, Google and Meta used the contents of the

7   communications knowing or having reasons to know that such information had been fraudulently

8   obtained through the interception of communications in violation of 18 U.S.C. 2511(1)(a).

9        272.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may

10  assess statutory damages to Plaintiff and the putative class members; injunctive and declaratory

11  relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same

12  or similar conduct by Defendants in the future, and reasonable attorney's fees and other litigation

13  costs reasonably incurred.

## COUNT V: VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"), CALIFORNIA PENAL CODE §§ 631 AND 632

16       273.    Plaintiff, individually, and on behalf of the putative California Class, incorporates

17  the foregoing allegations as if fully set forth herein.

18       274.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§

19  630 to 638.  The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology
> have led to the development of new devices and techniques for the purposes
> of eavesdropping upon private communications and that the invasion of
> privacy resulting from the continual and increasing use of such devices and
> techniques has created a serious threat to the free exercise of personal
> liberties and cannot be tolerated in a free and civilized society.

24  Cal. Penal Code § 630.

25       275.    California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or
> in any other manner … willfully and without the consent of all parties to the
> communication, or in any unauthorized manner, reads, or attempts to read,
> or to learn the contents or meaning of any message, report, or

communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place this state, or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done wany of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars…"

276.    CIPA is not limited to phone lines, but also includes and applies to new technologies such as computers, the Internet, and email.

277.    Under the CIPA, Defendants must show they had consent of all parties to the communication.  Here Plaintiff and the putative class members did not consent to Meta and Google intercepting, recording, collecting and transmitting their personal TRI data from H&R Block's website through the use of pixels.

278.    Both Google and Meta have their principal places of business in California, and designed, contrived and effectuated their schemes to intercept, record, track and transmit TRI data from H&R Block's website in California.

279.    Upon information and belief, both Meta and Google are believed to store taxpayers' personal TRI data, which was fraudulently obtained, on servers within the State of California.

280.    The following items constitute "machine[s], instrument[s] or contrivance[s]" under the CIPA, and even if they do not, Google and Meta deliberately and purposefully schemed to intercept TRI data under the broad statutory catch-all category of "any other matter":

    a.  The computer codes and pixels written and created by Google and Meta to intercept and collect Plaintiff's communication and TRI data;

    b.  Plaintiff's mobile and computing devices;

    c.  H&R Block's website, Google's web and ad servers and Meta's web and ad servers; and

    d.  The plan Google and Meta carried out to effectuate their tracking and interception of Plaintiff's communications.

281.    Defendants intentionally tapped the lines of internet connection between Plaintiff, the putative class members, and H&R Block by using pixels.

282.   These pixels were designed to intercept, read, and transmit the contents of Plaintiff's and the putative class members' communications containing highly sensitive and confidential TRI in violation of Cal. Penal Code § 632.

283.   Furthermore, Meta's Pixel and Google's GA violate Cal. Penal Code § 635, as these pixels and/or codes were intentionally designed by Meta and Google to "eavesdrop" and intercept communications between Plaintiff and the putative class members to H&R Block without the consent of Plaintiff and the putative class members.

284.   Plaintiff and the Class members have suffered loss by reason of these violations, including but not limited to, violation of their rights of privacy and loss of value in their personally-identifiable information.

285.   Pursuant to California Penal Code § 637.2, Plaintiff and the Class members have been injured by the violations of California Penal Code §§ 631 and 632, and each seek damages for greater of $5,000 or three times the amount of actual damage for each violation as well as injunctive relief.

286.   Specifically, Plaintiff and the Class members seek an injunction, as permitted under California Penal Code § 637.2 to enjoin Google and Meta from continuing to collect, intercept and/or record TRI data from H&R Block.  Additionally, Plaintiff and the Class members seek an injunction ordering Defendants Meta and Google to identify and destroy any and all TRI data collected on California taxpayers from H&R Block's website through the use of Meta's Pixel and Google's GA code.

\\

\\

\\

\\

\\

\\

\\

\\

COMPLAINT

1

**PRAYER FOR RELIEF**

2       287.    WHEREFORE, Plaintiff, individually and on behalf of the various classes described

3  herein, prays for the following relief:

4       A.  Find that this action satisfies the prerequisites for maintenance of a class action pursuant

5           to Federal Rules of Civil Procedure 23(a) and (b)(3), and certify the respective Classes;

6       B.  Designate Plaintiff as a representative for the respective Classes and Plaintiff's

7           undersigned counsel;

8       C.  Issue a judgment against Defendants that:

9           a.  Grants Plaintiff and the various Classes alleged herein refund of all moneys paid

10              for tax preparation services to H&R Block;

11          b.  Grants Plaintiff and the various Classes alleged herein refund of the value of their

12              TRI illicitly transmitted and used by Defendants;

13          c.  Grants Plaintiff and the Classes alleged herein an award of restitution and/or

14              disgorgement of Defendants' profits from their deceptive and unlawful

15              interception and transmission of TRI;

16          d.  Grants Plaintiff and the Classes alleged herein exemplary, treble, and punitive

17              damages sufficient to punish and deter Defendants and others from future

18              deceptive and unlawful practices;

19          e.  Grants Plaintiff and the Classes alleged herein statutory damages in amounts to

20              be determined by the Court and/or jury;

21          f.  Grants Plaintiff and the Classes alleged herein injunctive relief pursuant to

22              applicable statutory authority to permanently restrain Defendants from

23              intercepting, tracking, collecting and/or storing, in violation of the applicable

24              law, the TRI of Plaintiff and the Classes alleged herein;

25          g.  Grants Plaintiff and the various Classes alleged herein pre-judgment and post-

26              judgment interest;

27          h.  Grants Plaintiff and the various Classes alleged herein reasonable attorneys' fees

28              and costs of suit;

COMPLAINT

i.   Grants Plaintiff and the various Classes alleged herein such other and further relief as the Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

288.   Plaintiff demands a trial by jury on all of the triable issues within this pleading.

Dated:  September 27, 2023                    Respectfully Submitted,


R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
Harrison E. James, Esq. (SBN:337733)
hjames@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

Christopher L. Coffin (*Pro Hac Vice Forthcoming*)
ccoffin@coffinlawllc.com
**Coffin Law, LLC**
1311 Ave. Ponce de Leon, Suite 504
San Juan, Puerto Rico 00907
Tel: (787) 961-9988

Jessica A. Reynolds (*Pro Hac Vice Forthcoming*)
jreynolds@pbclawfirm.com
**PENDLEY, BAUDIN & COFFIN, LLC**
24110 Eden Street
Plaquemine, LA 70764
Phone: (225) 687-6396
Fax: (225) 687-6398

*Attorneys for Plaintiff*

COMPLAINT