R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
Harrison E. James, Esq. (SBN:337733)
hjames@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

Christopher L. Coffin (*Admitted Pro Hac Vice*)
ccoffin@coffinlawllc.com
**Coffin Law, LLC**
1311 Ave. Ponce de Leon, Suite 504
San Juan, Puerto Rico 00907
Tel: (787) 961-9988

Jessica A. Reynolds (*Admitted Pro Hac Vice*)
jreynolds@pbclawfirm.com
**PENDLEY, BAUDIN & COFFIN, LLC**
24110 Eden Street
Plaquemine, LA 70764
Phone: (225) 687-6396
Fax: (225) 687-6398

*Attorneys for Plaintiff*
JUSTIN HUNT

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN HUNT,<br><br>               Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC. f/k/a Facebook, Inc., a corporation; GOOGLE, LLC, a limited liability company; HRB Digital LLC, a limited liability company, HRB Tax Group, Inc., a corporation; and DOES 1 through 100 inclusive,<br><br>               Defendants. | Case No. 5:23-cv-04953-PCP<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS HRB DIGITAL, LLC AND HRB TAX GROUP, INC.'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Date:        April 18, 2024<br>Time:       10:00 a.m.<br>Judge:      Hon. P. Casey Pitts<br>Courtroom  8, 4th Floor |

**TABLE OF CONTENTS**

                                                                    **Page**

INTRODUCTION...............................................................................1

STATEMENT OF FACTS ..................................................................2

ARGUMENT ....................................................................................3

    I.   The Causes of Action Raised by Mr. Hunt and the Putative Class Members fall Outside the Scope of H&R Block's Online Services Agreement and Therefore are not Subject to Arbitration under the Agreement's Arbitration Clause ...........................3

    II.  Even if Mr. Hunt's claims were found to be Within the Scope of H&R Block's OSA, H&R Block's Arbitration Agreement is Invalid and Unenforceable due to Fraud and Unconscionability ................................................8

        A.   Mr. Hunt's Consent to H&R Block's Arbitration Agreement was Induced by Fraud .............................................8

        B.   H&R Block's Arbitration Agreement is Permeated with Unconscionability which Renders the Entire Agreement Unenforceable..................10

            1.   H&R Block's Arbitration Clause Creates an Unconscionable Sixty-Day Notice Requirement Designed to Delay the Demand for and Initiation of Arbitration..................11

            2.   H&R Block's Arbitration Clause Creates an Unconscionable Restriction on Amendment of Claims and Tolling.........................13

            3.   H&R Block's Arbitration Clause Creates an Unconscionable and Chilling Statute of Limitations Trap ................................14

            4.   H&R Block's Arbitration Agreement Bans Mass Arbitration and Gives Rise to an Unconscionable Delay for the Prosecution of Similar Claims ................................15

            5.   H&R Block's Arbitration Agreement is so Permeated with Unconscionability it Must be Deemed Unenforceable as a Whole .19

CONCLUSION ................................................................................20

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

# TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Armendariz v. Found Health Psychcare Servs., Inc.*,
  24 Cal. 4th 83 (2000) ........................................................................................................ 10, 19

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011) ...................................................... 3

*Brown v. Dow Chem. Co.*,
  No. 18-cv-07098-MMC, 2019 WL 484211 (N.D. Cal. Feb. 7, 2019) ...................................... 15

*Circuit City Stores, Inc. v. Najd*,
  294 F.3d 1004 (9th Cir. 2002) ............................................................................................. 11

*Dietrich v. Boeing Co.*,
  14 F.4th 1089 (9th Cir. 2021) .............................................................................................. 17

*Doctor's Assocs., Inc. v. Casarotto*,
  517 U.S. 681, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996) ...................................................... 3

*Doe 1 v. AOL LLC*,
  552 F.3d 1077 (9th Cir.2009) ............................................................................................... 18

*Jackson v. Amazon.com, Inc.*,
  65 F.4th 1093 (9th Cir. 2023) ........................................................................................ passim

*Kilgore v. KeyBank, Nat'l Ass'n*,
  718 F.3d 1052 (9th Cir. 2013) ............................................................................................. 10

*Lifescan, Inc. v. Premier Diabetic Servs. Inc.*,
  363 F.3d 1010 (9th Cir. 2004) ............................................................................................... 1

*Little v. Auto Stiegler, Inc.*,
  29 Cal. 4th 1064 (2003) ....................................................................................................... 11

*MacClelland, et al. v. Cellco Partnership, et al.*,
  609 F. Supp. 3d 1024 (N.D. Cal. 2022) ............................................................................ passim

*Mills v. Facility Sols. Grp.*,
  84 Cal. App. 5th 1035 (2022) ............................................................................................... 19

*Pokorny v. Quixtar*,
  601 F.3d 987 (9th Cir. 2010) .......................................................................................... 10, 18

ii

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967) ............................................................................. 8

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ............................................................................... 8

*Rosenthal v. Great Western Fin. Sec. Corp.*,
  14 Cal. 4th 394 (1996) ......................................................................... 9

*Simula, Inc. v. Autoliv. Inc.*,
  175 F.3d 716 (9th Cir. 1999) ................................................................ 4

*Specht v. Netscape Communications Corp.*,
  306 F.3d 17 (2nd Cir. 2002) .............................................................. 7, 8

*Ting v. AT&T*,
  319 F.3d 1126 (9th Cir. 2003) ............................................................ 11

*Wildman v. Pac. Coast Indep. Brokerage, Inc.*,
  16 F. App'x 741 (9th Cir. 2001) ....................................................... 8, 9

**<u>Statutes</u>**

9 U.S.C. § 2 ............................................................................................ 3

Cal. Civ. Code § 1670.5 .................................................................. 10, 19

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

Plaintiff Justin Hunt ("Plaintiff" or "Mr. Hunt"), through undersigned counsel, respectfully submits this memorandum in opposition to Defendants HRB Digital, LLC and HRB Tax Group, Inc.'s (collectively, "H&R Block") Motion to Compel Arbitration and to Stay Litigation ("Mot. to Compel"). ECF No. 86.

## INTRODUCTION

Under the Federal Arbitration Act, a district court is charged with determining whether a valid agreement to arbitrate exists and, if so, whether the agreement encompasses the scope of the dispute at issue. *See Lifescan, Inc. v. Premier Diabetic Servs. Inc.,* 363 F.3d 1010, 1012 (9th Cir. 2004). The power of this Court to make these determinations is clearly set forth within the arbitration agreement itself, which states in pertinent part, "[a]ll issues are for the arbitrator to decide, except that issues relating to the arbitrability of the disputes and the validity, enforceability, and scope of this Arbitration Agreement…shall be decided by a court and not an arbitrator." 2023 H&R Block Online Services Agreement, Ex. 4 to the Declaration of Valerie Schuessler ("Schuessler Decl.") at ¶ 11.1. ECF No. 88-4

Plaintiff used H&R Block's tax preparation service for the purpose of preparing his federal tax returns. As part of that process, he was required to sign Defendant's Online Services Agreement ("OSA") governing the use of H&R Block's products and services. The OSA also contained an arbitration agreement regarding the resolution of any disputes arising under the agreement. Although Plaintiff agreed to the OSA, his complaints and allegations in this case are not about H&R Block's tax preparation products or services. Rather, Plaintiff's claims relate solely to the use of Meta's and Google's products and services to intercept, collect, record, and transmit data illegally from H&R Block's website to Meta and Google.

As set forth below, H&R Block's Motion to Compel Arbitration should be denied on multiple grounds. First, the gravamen of Mr. Hunt's claims fall outside the scope of H&R Block's OSA as the harm in this case was caused by products and/or services of Meta and Google, and not by the products and/or services of H&R Block. However, should this court find that the dispute at issue is within the scope of the OSA, the arbitration agreement nonetheless fails as it was induced by fraud and is permeated with numerous unconscionable provisions.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

**STATEMENT OF FACTS**

Plaintiff filed his Second Amended Complaint on December 6, 2023, alleging that H&R Block violated civil RICO statutes by forming illegal enterprises with Google and Meta to fraudulently intercept Tax Return Information ("TRI"), in contravention of IRS regulations, for profit. Second Amended Complaint, ECF No. 36 at ¶¶ 126-146 and ¶¶ 147-167. In order to carry out this scheme, Meta and Google used unique codes, called pixels, to collect data. *Id.* at ¶ 22. These pixels were products and services offered by Google and Meta which acted as "spy cams" designed to quietly intercept, collect and transmit data once embedded. *Id.* at ¶ 23. H&R Block willingly installed Meta's Pixel and Google's Google Analytics onto its website. *Id.* at ¶¶ 133 and 153. H&R Block, as a tax preparer, was well aware that allowing third parties such as Meta and Google to intercept, collect, record and transmit TRI was illegal. *Id.* at ¶¶ 131 and 152. Upon installing Meta's and Google's pixel products/services, Meta and Google began to receive TRI in real time. *Id.* at ¶¶ 134 and 153. This interception and collection of data for profit was performed and carried out by the products and services of Meta and Google, not the products or services of H&R Block. *Id.* at ¶¶ 126-146 and ¶¶ 147-167. Tragically, Mr. Hunt and the putative class members were unaware that their TRI was being illegally intercepted, collected, recorded and transmitted. *Id.* at ¶¶ 135, 138, 156, and 158. To the contrary, Mr. Hunt was under the misguided impression that his TRI would be properly protected from dissemination to third parties. *Id.* at ¶¶ 200, 201. Had Mr. Hunt been made aware that H&R Block did not intend to comply with applicable law, and instead was engaged in an illegal enterprise with Meta and Google to share his highly sensitive TRI, he would not have used H&R Block. ¶¶ 202, 212.

Considering these allegations, H&R Block now attempts to shield itself from the weight of potential liability imposed by a nationwide civil RICO class action by hiding behind its OSA. *See* Mot. to Compel, ECF No. 86. As set forth in its motion, H&R Block seeks to invoke the arbitration agreement contained within its OSA. *Id.* While the OSA upon which H&R Block relies contains an arbitration agreement, it also plainly states that the intent of the agreement is to cover disputes arising from the use of H&R Block's products and services. 2023 H&R Block Online Services Agreement, Ex. 4 to the Schuessler Decl. at §§ 1.1 and 1.3 (ECF No. 88-4); Mot.

1 | to Compel, ECF No. 86, pp. 8-9.

2 | **ARGUMENT**

3 | The Federal Arbitration Act (FAA) makes agreements to arbitrate "valid, irrevocable, and

4 | enforceable, save upon such grounds as exist at law or in equity for the revocation of any

5 | contract." 9 U.S.C. § 2. However, causes of action that fall outside the scope of those issues the

6 | parties agree to arbitrate are not subject to arbitration. *See Jackson v. Amazon.com, Inc.*, 65 F.4th

7 | 1093 (9th Cir. 2023). In addition, the saving clause in 9 U.S.C. § 2 permits arbitration agreements

8 | to be invalidated by general contract defenses, such as fraud, duress, or unconscionability. *See*

9 | *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1746, 179 L. Ed. 2d 742

10 | (2011); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S. Ct. 1652, 1656, 134 L.

11 | Ed. 2d 902 (1996).

12 | **I. The Causes of Action Raised by Mr. Hunt and the Putative Class Members fall**
13 | **Outside the Scope of H&R Block's Online Services Agreement and Therefore are not Subject to Arbitration under the Agreement's Arbitration Clause**

14 | To determine whether a dispute must be arbitrated, the Court must first look at the content

15 | of the arbitration clause and the scope of the agreement in which it is contained. *See Jackson*, 65

16 | F.4th at 1101. As Defendants admit in their motion to compel arbitration, the arbitration clause at

17 | issue here is contained within their OSA. Mot. to Compel, ECF No. 86, pp. 8-9. The 2023 OSA

18 | upon which H&R Block relies states: "This Online Services Agreement ("OSA") is a contract

19 | between you and HRB Digital LLC and HRB Tax Group, Inc. (together, "H&R Block," "we," or

20 | "us"). **This agreement governs your use of Products and Services** (defined in Section 15[1])

21 | **provided by H&R Block, H&R Block Affiliates** (defined in Section 15[2]), **and H&R Block's**

---

[1] §15.3 of 2023 H&R Block's Online Services Agreement defines Products and Services as: "the Software, the Products and Services listed and described in Section 6, and any other product or service offered or delivered by H&R Block, H&R Block Affiliates, or their franchisees, that you select, pay for, or use. § 6 describes Products and Services as the 2022 Software, electronic filing services (which is used to file a customer's taxes), MyBlock Account (online portal that allows the customer to input information and interact with a tax professional), Online Assist (which allows customers to submit tax-related questions through a chat function), Tax Pro Review (which provides tax advice), Importing of Tax Information, Healthcare Subsidiary Reconciliation and Penalty Calculation, and Assisted Tax Prep Services. Section 15 contains no language defining the use of Meta's Pixel or Google's Google Analytics as a product or service of H&R Block.

[2] §15.2 defines H&R Block Affiliates to include: "any entities that directly or indirectly control, or are controlled by, or are under the common control with HRB Digital LLC or HRB Tax Group, Inc. Section 15 does not contain any

3

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

**third party independently owned franchisees**…This Agreement includes a mutual binding arbitration agreement…" 2023 Online Services Agreement, Ex. 4 to the Schuessler Decl. at §§ 1.1 and 1.3 (ECF No. 88-4); and Mot. to Compel, ECF No. 86, pp. 8-9. The applicable arbitration provision in this matter states it applies "to all disputes and claims between you and the H&R Block Parties." 2023 Online Services Agreement, Ex. 4 to the Schuessler Decl. at § 11.1. ECF No. 88-4. Although H&R Block has failed to produce an OSA for each tax year contained within the class period, the OSAs which have been produced all define the scope of the OSA as governing the use of "Products and Services" provided by H&R Block. See Exhibit 1, 2022 Online Services Agreement at §1.1, §6 and §15.3; 2021 Online Services Agreement at §1.1, §6 and §15.3; and 2020 Online Services Agreement at §1.1, §6 and §15.3.

The Ninth Circuit has held that even broad arbitration clauses, like the one at issue herein, must at least "touch matters covered by the contract containing the arbitration clause." *Simula, Inc. v. Autoliv. Inc.,* 175 F.3d 716, 721 (9th Cir. 1999). In accepting the terms of H&R Block's OSA, Plaintiff agreed to arbitrate claims/disputes **arising out of the use of H&R Block's products and services**. To decide whether a dispute falls within the scope of an arbitration agreement and its associated contract the court must examine the factual allegations raised in the Plaintiff's complaint. *See Jackson,* 65 F.4th 1093 at 1101. Here, the gravamen of Plaintiff's complaint centers upon the enterprises use of Meta's and Google's products and services, namely Meta's "Pixel" and Google's "Google Analytics," to fraudulently intercept TRI, in contravention of IRS regulations, for profit. Second Amended Complaint, ECF No. 36 at ¶¶ 126-146 and ¶¶ 147-167. As set forth in detail in the complaint, the interception and collection of TRI for profit was performed and carried out by the products and services of Meta and Google, not the products or services of H&R Block. *Id.*

This court need not go out on a limb to find that Meta's Pixel and Google's Google Analytics are not products or services of H&R Block. Both Meta and Google have judicially admitted to this court that Meta's Pixel and Google's Google Analytics are products and services

---

language which defines Meta and/or Google as H&R Block Affiliates, and Plaintiff certainly did consent to Meta or Google receiving his TRI.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

of Meta and Google respectively. *See In re Meta Pixel Tax Filing Cases,* 5:2022-cv-07557, ECF Nos. 107, 107-1, 107-3, 107-4, and 107-6 (acknowledging, through Meta's terms of service, that Meta's Pixel is a product and service of Meta) and *Smith v. Google, LLC,* 5:23-cv-03527-BLF, ECF Nos. 47, 47-3 and 53 (acknowledging, through Google's terms of service, that Google Analytics is a product and service of Google). As alleged in the complaint, neither Meta's Pixel nor Google's Google Analytics assisted with the preparation of tax returns, the sole product and service of H&R Block. Second Amended Complaint, ECF No. 36 at ¶¶ 126 and 147. Rather, Meta's Pixel and Google's Google Analytics, were responsible for the illegal interception, collection, recordation and transmission of TRI. *Id.* at ¶¶ 131, 132, 134, 152, 153, and 154. Given that the codes/pixels responsible for collecting, transmitting and intercepting Mr. Hunt and the putative class members' TRI are products and services of Google and Meta and not products and/or services of H&R Block, Mr. Hunt's claims fall outside the scope of H&R Block's OSA and therefore, should not be subject to arbitration.

Courts across various jurisdictions have found that claims which do not touch matters covered by the contract containing the arbitration clause fall outside of scope of the agreement and should not be subject to arbitration. In *Jackson v. Amazon*, the Ninth Circuit interpreted a broad arbitration clause in an employment contract and held that although Plaintiff was an employee of Amazon, his complaints of invasion of privacy for his participation in an Amazon driver's Facebook group fell outside the scope of his employment contract because his claims were not rooted in his employment relationship. 65 F.4th at 1101-1102. The plaintiff alleged that Amazon illegally wiretapped and intercepted communications of its Flex drivers without their consent and invaded the drivers' privacy by monitoring the drivers' closed Facebook groups. *See id.* at 1096. Amazon moved to arbitrate, "because the alleged monitoring of drivers' conversations took place while drivers were performing deliveries for Amazon." *Id.* at 1104. The plaintiff had agreed, as a part of his Flex driver employment contract, to arbitrate "any dispute or claim…arising out of or relating in any way" to his employment agreement. *Id.* at 1101. Mr. Jackson did not dispute that he was an Amazon employee at the time he participated in the Facebook group. *See id.* at 1101-1102. However, the court noted that Mr. Jackson's claims were not dependent upon his

1    employment status because the same claims could have been brought by other members of the

2    Facebook group who were permitted to join, such as spouses, union organizers and other

3    interested persons, even though those members were not Amazon employees. *See id.* at 1102.

4    Since the gravamen of the plaintiff's claims related to employer misconduct as to whether Amazon

5    was liable for wiretapping and invasion of privacy, the Ninth Circuit reasoned that the dispute did

6    not "touch on any matters related to the contract [employment] that would fall within the

7    arbitration clause." *Id.* at 1102-1103.

8         Like the plaintiff in *Jackson*, Mr. Hunt's claims are not dependent upon his use of H&R

9    Block's products and services.  Contrary to the framing put forth by H&R Block, Mr. Hunt's

10   claims, and those of the putative class members are rooted in the use of Meta's and Google's

11   codes and pixels to illegally intercept, collect, and transmit TRI for the profit of the illegal

12   enterprise established by the Defendants in concert with one another.  It is Meta's Pixel and

13   Google's Google Analytics which are responsible for the interception and transmission of TRI, not

14   the software and/or products or services of H&R Block.  Second Amended Complaint, ECF No.

15   36 at ¶¶ 131, 132, 133, 134, 152, 153, 154, and 155.   Here the harm suffered is not measured by

16   or dependent upon the terms of H&R Block's OSA.  Rather the harm suffered is measured by the

17   amount of TRI illegally intercepted, collected and transmitted by Google's Google Analytics and

18   Meta's Pixel.  Just as the Ninth Circuit recognized in *Jackson*, that Mr. Jackson's claims were not

19   dependent upon his employment status because the same claims could have been brought by other

20   members of the Facebook group who were not Amazon employees, Mr. Hunt's claims are not

21   dependent upon his use of H&R Block's products and services which are covered under the OSA.

22   Rather, other persons who did not use or consent to the use of H&R Block's OSA can likely assert

23   the same claims.  As set forth in the complaint, the TRI illegally transmitted contained information

24   pertaining to Mr. Hunt's dependents.  Second Amended Complaint, ECF No. 36 at ¶¶ 4 and 87.

25   Although these dependents did not accept H&R Block's OSA, they would be capable of bringing

26   the same claims as Mr. Hunt since their personal information was transmitted without their

27   consent.  Additionally, although spouses may have filed a joint tax return with H&R Block, only

28   one spouse was required to establish an account and consent to H&R Block's OSA.  As a result,

the jointly filing spouse who did not consent to H&R Block's OSA, but still had their TRI illegally intercepted, collected, and transmitted by Meta and Google, would have the same claims as the spouse who assented to the OSA. The same would be true for persons who consented to the OSA but subsequently opted out of the arbitration agreement. These other persons who have been harmed but never created an account with H&R Block, never consented to H&R Block's OSA, and/or consented to the OSA but opted out of arbitration are akin to the other members of the Facebook group in *Jackson* because they can bring the same claims as Mr. Hunt. Given that the gravamen of Mr. Hunt's claims are related to the products and services of Meta and Google, rather than the products and services of H&R Block, the dispute at issue cannot be said to touch on any matters related to H&R Block's OSA. As such, this Court should deem Mr. Hunt and the putative class members' claims to fall outside the scope of H&R Block's OSA's arbitration agreement.

This approach is consistent with other circuits. The Second Circuit, in a case more factually like the matter at hand, reached the same conclusion. In *Specht v. Netscape Communications Corp.,* plaintiffs downloaded a software program called SmartDownload which was promoted as a program designed to enhance the functioning of a separate internet browsing software called Netscape Communicator. 306 F.3d 17, 21 (2nd Cir. 2002). When downloading the Communicator software, plaintiffs were required to agree to licensing terms governing the use of Communicator, which also contained an arbitration clause. *See id.* Plaintiffs alleged that unbeknownst to them, their use of SmartDownload resulted in the transmission of private information regarding their internet history, acting like an electronic surveillance of their online activities, back to Defendant Netscape's Communicator software. *See id.* Netscape argued the arbitration provision in the terms of license for the Communicator software applied to plaintiffs' claims in part because plaintiffs' complaint was filled with allegations that Communicator and SmartDownload operated in conjunction to eavesdrop on the plaintiff's internet activities. *See id.* at 22, 37. The Second Circuit, looking towards the allegations in plaintiffs' complaint, found that plaintiffs' allegations were premised upon the SmartDownload software being responsible for the eavesdropping and transmission of information back to Communicator, as Communicator's software was not responsible for the actual eavesdropping and transmission of information. *See*

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

id. at 38. The Second Circuit concluded that plaintiffs' claims fell outside the scope of the Communicator license agreement, even though their allegations involved an interrelated relationship between the two software programs. *See id.* The court's analysis turned on which software was responsible for the harm, or phrased another way, which software was responsible for the actual collection and transmission of information. Here, much like the plaintiff in *Specht,* Mr. Hunt's claims center upon the Meta Pixel and Google Analytics' role in the collection and transmission of illegally obtained TRI. As emphasized above, no H&R Block products were involved in this collection and transmission. As such, Mr. Hunt's claims fall outside the scope of H&R Block's OSA and should not be subject to arbitration.

**II.  Even if Mr. Hunt's claims were found to be Within the Scope of H&R Block's OSA, H&R Block's Arbitration Agreement is Invalid and Unenforceable due to Fraud and Unconscionability**

The arbitration agreement which Mr. Hunt entered by accepting H&R Block's OSA is not only the biproduct of fraud, but it is permeated with unconscionability, rendering it invalid in its entirety.

**A.  Mr. Hunt's Consent to H&R Block's Arbitration Agreement was Induced by Fraud**

"To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967). The Supreme Court has recognized that a party opposing arbitration, based on fraud, must direct its challenge towards fraud in the inducement of the arbitration agreement itself, rather than fraud in the inducement of the overall contract. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). This principle likewise applies under California law, which requires a court to decide whether the alleged fraud was specifically directed at the arbitration clause in order to render such an agreement unenforceable. *See Wildman v. Pac. Coast Indep. Brokerage, Inc.*, 16 F. App'x 741, 743 (9th Cir. 2001). "To succeed on a claim of fraud in the inception, 'plaintiffs must show their apparent assent to the contracts—their signatures on [the] agreements—is negated by fraud so fundamental that they were deceived as to the basic character of the documents they signed and had no reasonable opportunity to learn

the truth.'" *Id.* (citing *Rosenthal v. Great Western Fin. Sec. Corp.,* 14 Cal. 4th 394, 425 (1996)). "A misrepresentation of the contract's contents alone does not render a contract's contents void 'where the defrauded party had a reasonable opportunity to discover the real terms of the contract.'" *Id.*

The arbitration agreement which Mr. Hunt consented to was induced by fraud as it assured Mr. Hunt that the sharing of his TRI would only be disclosed in compliance with the law. Specifically, the arbitration agreement states: "…a signed statement is required by law to authorize the H&R Block parties to disclose your confidential tax and account records to your counsel." 2023 Online Services Agreement, Ex. 4 to Schuessler Decl. at § 11.2 (B).[3] ECF No. 88-4. This statement induced Mr. Hunt to reasonably believe that H&R Block would comply with all legal requirements and applicable laws governing the disclosure of his TRI to third parties, such as an attorney, and would not disclose such information without his express written consent. Mr. Hunt's belief that H&R Block would protect his TRI from third parties in accordance with the law was reinforced numerous times within the remainder of the OSA. Furthermore, through the OSA, H&R Block represented to Mr. Hunt that it would keep a copy of his tax information [TRI] "in compliance with applicable law." *Id.* at § 4.3(A). These representations reinforced Mr. Hunt's reasonable belief that H&R Block would comply with applicable law when sharing his and the putative class members' TRI with third parties. That did not happen.

As set forth in the Second Amended Complaint, Mr. Hunt had a reasonable expectation that his TRI would be properly protected from dissemination to third parties. SAC ¶¶ 200, 201. Mr. Hunt and the putative class members expected H&R Block to be honest in their dealings and to protect their TRI in compliance with federal law, which prohibits the sharing of such information with third parties such as Meta and Google. *Id.* ¶ 228. This did not happen. At the time Mr. Hunt and the putative class members consented to this 2023 arbitration agreement, H&R Block had been in the process of colluding with Google and Meta for over seven years to use Google's and Meta's products and services to illegally intercept Mr. Hunt's TRI for profit. *Id.* ¶¶

---

[3] Interestingly, this language does not appear in the 2020 or 2021 version of the arbitration agreement.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

113, 114, 135,137, 138, 141, 156, 158, 160, and 182.  The misrepresentations made by H&R Block were designed to create a false sense of security to deceive Mr. Hunt and the putative class members into believing their TRI was being properly protected from interception by third parties. *Id.* ¶¶ 107, 112, 173, and 177.

Despite Mr. Hunt's best efforts, he would not have been able to uncover that he was being deceived, and was instead the victim of fraud perpetrated by the illegal enterprises formed by H&R Block, Meta, and Google.  Had Mr. Hunt been made aware that H&R Block did not intend to comply with applicable law, as referenced within the arbitration agreement, and would instead be sharing his highly sensitive TRI data with Meta and Google, Mr. Hunt would not have used H&R Block. *Id.* ¶¶ 202, 212.  Mr. Hunt's assent to the arbitration agreement and OSA is therefore negated by the fraud which fundamentally deceived Mr. Hunt and the putative class members into reasonably believing that their TRI would be properly protected in compliance with the law.  As a result of this fraud in the inception of the arbitration agreement itself, H&R Block's arbitration agreement should be deemed unenforceable.

**B.     H&R Block's Arbitration Agreement is Permeated with Unconscionability which Renders the Entire Agreement Unenforceable**

Courts look to state law governing contracts when determining whether or not an arbitration agreement is enforceable.  *See Pokorny v. Quixtar*, 601 F.3d 987, 994 (9th Cir. 2010).  "Under California law, a contractual provision is unenforceable if it is both procedurally and substantively unconscionable."  *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (citing *Armendariz v. Found Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 89 (2000)).  However, procedural and substantive unconscionability need not be present to the same degree.  *See Armendariz*, 24 Cal. 4th at 114.  "In other words, the more substantially oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Id.*  Pursuant to California law, if a court finds a provision within a contract to be unconscionable it may refuse to enforce that provision and/or refuse to enforce the contract as a whole if it is permeated with unconscionability.  *See id.*; Cal Civ Code § 1670.5, subdivision (a).

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

"A contract is procedurally unconscionable if it is a contract of adhesion, *i.e.*, a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). Here, H&R Block presented Mr. Hunt with a take it or leave it offer. As clearly set forth in H&R Block's declaration by Valerie Schuessler, a client, like Mr. Hunt, is not allowed to access any of H&R Block's tax software until the client first accepts H&R Block's OSA. *See* Schuessler Decl., ECF No. 88 at ¶¶ 8-9. The only choice presented by H&R Block, the party with superior bargaining strength, to Mr. Hunt and the putative class members was to either accept or reject the standardized OSA. Thus, the contract Mr. Hunt and the putative class members entered into was one of adhesion.

Not only can Mr. Hunt and the putative class members demonstrate they entered a procedurally unconscionable contract of adhesion, but they can also show significant substantive unconscionability within the arbitration agreement itself. "Under California law, substantive unconscionability focuses on the terms of the agreement and whether those are 'overly harsh' or 'one-sided.'" *MacClelland, et al. v. Cellco Partnership, et al.,* 609 F. Supp. 3d 1024, 1035 (N.D. Cal. 2022) (citing *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1004, 1108 (9th Cir. 2002) and *Little v. Auto Stiegler, Inc.,* 29 Cal. 4th 1064, 1071 (2003)). The arbitration agreement at issue here is overly harsh and one-sided as it creates an unconscionable sixty-day notice designed to delay the demand of arbitration, it creates various unconscionable statute of limitations traps, and bans mass arbitrations for the sole purpose of subjecting claimants to an unconscionable delay and inferior forum in which to adjudicate their claims.

1.    **H&R Block's Arbitration Clause Creates an Unconscionable Sixty-Day Notice Requirement Designed to Delay the Demand for and Initiation of Arbitration**

The arbitration clause within H&R Block's OSA creates an unconscionable pre-arbitration administrative process that is designed to delay the initiation and adjudication of claims and to create a cumbersome process to discourage consumers from pursuing their claims. Courts have routinely considered the chilling effect that such cumbersome processes may have on consumers considering whether to vindicate their rights. *See MacClelland, et al.,* 609 F. Supp. 3d at 1041

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

1   (citing multiple examples).

2          Here, the OSA provides that a party seeking to commence arbitration must first provide

3   written notice by mail to H&R Block. See 2023 Online Services Agreement, Ex. 4 to Schuessler

4   Decl. at §11.2(A).  ECF No. 88-4. Upon receipt of this written notice by H&R Block, the parties

5   then have up to sixty days to request an informal settlement conference.  *See id.* at § 11.2(B).  The

6   agreement mandates that the parties "participate in a good-faith effort to settle the dispute without

7   the need to proceed to arbitration."  *Id.*  However, the agreement is silent as to what discovery if

8   any is permitted prior to a plaintiff being forced to engage in an informal settlement conference.

9   Furthermore, the agreement sets forth no rules or procedures for how the informal settlement

10  conference will be conducted or who will preside over it, other than it may be held by phone

11  and/or video.  *See id.*  It also provides no means for a plaintiff to opt out of the informal settlement

12  process and proceed directly with a demand for arbitration.  *See id.* at § 11.2(C).  Instead, the

13  agreement outright bars the initiation of a demand for arbitration or the collection of fees during

14  this arbitrary sixty-day informal resolution period.  *See id.*  If this were not enough, the OSA

15  threatens that any plaintiff who fails to comply with this oppressive pre-arbitration procedure will

16  be enjoined from filing or prosecuting any claim in arbitration.  *See id.*

17         Although the arbitration agreement states arbitration shall be conducted by the American

18  Arbitration Association's Consumer Arbitration Rules ("AAA Rules"), the arbitrary pre-

19  arbitration notice, and informal settlement procedures are in direct conflict with the AAA Rules

20  governing demands for arbitration.  *See id.* at § 11.3.  Under the AAA Rules, a party may demand

21  arbitration be initiated by making a demand for arbitration against the other party in writing.

22  Exhibit 2, AAA Rules at R-2(a)(1).  The demand should briefly explain the dispute, names and

23  addresses of parties, the amount of money in dispute, location for an in-person hearing, and a

24  statement as to what relief the claimant seeks.  *See id.*  The party against whom arbitration is

25  sought will then have fourteen days to file an answer, but regardless of whether an answer is filed,

26  the case will move forward within fourteen days from the demand.  *See id.* at R-2(1)(c).  Notably,

27  nothing within the AAA Rules sets forth a pre-notice delay requirement before a party can demand

28  arbitration.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

1    As the AAA Rules demonstrate, an arbitration process can be straightforward and efficient. In

2    contrast, H&R Block's arbitration agreement creates multiple cumbersome processes, making it

3    unconscionable as a whole.

**2.      H&R Block's Arbitration Clause Creates an Unconscionable Restriction on Amendment of Claims and Tolling**

6          Although tolling is offered, it only applies when a claimant adheres to the arbitrary

7    informal settlement and notice procedure. 2023 Online Services Agreement, Ex. 4 to Schuessler

8    Decl. at §§ 11.2(B) and 11.6. ECF No. 88-4. Furthermore, tolling is only extended to those claims

9    set forth in the notice and H&R Block reserves its right to bring a statute of limitations defense

10   against claims not included in the initial arbitrary pre-arbitration notice. *See id.* Likewise, even if

11   Plaintiff asserted his/her claims in a timely manner and complied with the pre-notice requirement,

12   but later sought to amend his/her claims when initiating a demand for arbitration, any new or

13   modified claims within the demand for arbitration would not be tolled. *See id.* Essentially, the

14   arbitration agreement creates an unconscionable sixty-day time period for a claimant to present all

15   of their potential claims as a mandatory prerequisite to arbitration with no ability to amend.

16   Failure to include every potential claim in the arbitrary sixty-day notice automatically results in

17   those claims not being subject to tolling.

18          This limitation on amendments and tolling is in stark contrast to the AAA Rules. The

19   AAA Rules do not limit a claimant to the claims made in his/her initial demand for arbitration.

20   Rather, the AAA Rules permit a claimant to amend his/her claims, including adding new claims or

21   counterclaims, in writing prior to the appointment of an arbitrator. *See* Exhibit 2 at R.8. If an

22   arbitrator has been appointed, amendments to a claimant's claim may still be made with the

23   arbitrator's permission. *See id.* In contrast, H&R Block's arbitration clause forces claimants to

24   put forth all their potential claims within the mandatory prerequisite notice and does not allow for

25   amendment. Any claims not set forth in the initial notice, under H&R Block's arbitration clause,

26   will not receive the benefit of tolling and will be subject to a statute of limitations defense. Yet,

27   the arbitration clause places no restrictions on H&R Block's ability to modify its claims or

28   defenses. This lack of mutuality and the restriction on amendments and tolling is unconscionable.

13

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

### 3. H&R Block's Arbitration Clause Creates an Unconscionable and Chilling Statute of Limitations Trap

Generally, contractual agreements that shorten time periods for commencing an arbitration, delay arbitrations, and/or impose a short notice provision within which to present all claims have been found unconscionable as they erect a potential statute of limitations trap. *See MacClelland, et al.,* 609 F. Supp. 3d at 1024. Under the terms of H&R Block's arbitration agreement a user must give notice of any claims they intend to pursue in arbitration. After such notice is provided, either party may demand an informal settlement conference within sixty days. The agreement does not place any time restriction by when the informal settlement conference must occur. Consequently, months may pass before an informal settlement conference is held. Extending the process, the agreement requires the claimant to wait an additional thirty days following any informal settlement conference before the claimant may finally lodge a demand for arbitration. *See* 2023 Online Services Agreement, Ex. 4 to Schuessler Decl. at § 11.2. ECF No. 88-4. In total, this initial process is likely to last at least one-hundred and twenty days. Any claims that the user did not include in the initial notice are not tolled during this time period, rather the statute of limitations on such claims continues to run. This results in a far shorter statute of limitations time period than the user otherwise would be entitled to under the law.

This becomes exceptionally problematic for a plaintiff who is approaching the statute of limitations deadline for asserting his/her claims. For example, if a plaintiff seeks to demand an arbitration a week before his/her claims run, H&R Block's arbitration agreement reserves the right for H&R Block to deem that demand to be "improperly commenced" and enjoin that claimant from being able to demand arbitration all together for failure to comply with the pre-arbitration notice requirements.

This system of delay is set to benefit only one party to the contract, H&R Block, which retains its rights and defenses while forcing a plaintiff to set forth all of his/her potential claims in the arbitrary pre-notice before even attempting to demand arbitration or risk losing them forever. Such a statute of limitations trap is unconscionable. Furthermore, this provision has a chilling effect on plaintiffs seeking to demand arbitration in order to preserve all their claims. Such overly harsh and one-sided limitations which run afoul of the bedrock legal principles are

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

unconscionable. *See MacClelland*, 609 F.Supp. 3d. at 1035 ("[a] contractual clause restricting the period in which an arbitration may be commenced is unconscionable where the period is 'far shorter' than that otherwise available under California law.") (quoting *Brown v. Dow Chem. Co.*, No. 18-cv-07098-MMC, 2019 WL 484211, at *4 (N.D. Cal. Feb. 7, 2019)).

**4.    H&R Block's Arbitration Agreement Bans Mass Arbitration and Gives Rise to an Unconscionable Delay for the Prosecution of Similar Claims**

The limitations invoked by the arbitration clause regarding mass arbitration and the process for adjudicating similar claims give rise to unconscionable and endless delays which serve to benefit only one party to the contract, H&R Block.

A recent opinion from this district is instructive in this matter. In *MacClelland, et al. v. Cellco Partnership, et al.*, the court closely examined and found an arbitration agreement to be substantively unconscionable due to a restrictive mass arbitration provision. 609 F. Supp. 3d 1024, 1042–44 (N.D. Cal. 2022). The provision at issue in the case stated in pertinent part:

> If 25 or more customers initiate notices of a dispute with Verizon Wireless raising similar claims, and counsel for the Verizon Wireless customers bringing the claims are the same or coordinated for these customers, the claims shall proceed in arbitration in a coordinated proceeding. Counsel for the Verizon Wireless customers and counsel for Verizon Wireless shall each select five cases to proceed first in arbitration in a bellwether proceeding. The remaining cases shall not be filed in arbitration until the first ten have been resolved. If the parties are unable to resolve the remaining cases after the conclusion of the bellwether proceeding, each side my select another five cases to proceed to arbitration for a second bellwether proceeding. This process may continue until the parties are able to resolve all of the claims, either through settlement or arbitration. A court will have authority to enforce this clause and, if necessary, to enjoin the mass filing of arbitration demands against Version.

*Id.* at *1040. The court found that the mass arbitration provision, triggered by the filing of 25 or more similar claims by the same set of counsel, created a cap on the number of arbitrations that could proceed at one time and in turn significantly delayed plaintiffs' rights to timely adjudicate their claims. *Id.* Statistics from the American Arbitration Associated show the average arbitration proceeding takes nearly seven months to reach disposition. *Id.* As the court reasoned, these

statistics combined with the 2,721 clients who retained counsel in *MacClelland* and the limitations set forth in the mass arbitration provision would result in possible delays of 156 years. *Id.* The court found the provision to be substantively unconscionable and in conflict with American Arbitration Association's Supplementary Rules for Multiple Case Filings which, unlike the arbitration agreement, do not require a party to wait a set amount of time before initiating a demand in arbitration, do not require cases to be tried in tranches or waves, and allow for parties to opt out of global mediation. *Id.* at 1043. Additionally, the provision at issue in *MacClelland* lacked mutuality as it placed restrictions on plaintiffs' counsel with 25 or more claimants but allowed for the defendant to freely select the same counsel to represent it in all of its arbitrations. *Id.* at 1042.

      The arbitration agreement at issue here, is very similar to the arbitration agreement in *MacClelland*. Here the provision banning mass arbitrations states in pertinent part:

> If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinate counsel (regardless of whether the cases are submitted simultaneously), all of the cases must be resolved in arbitration in stages using staged bellwether proceedings if they are not resolved during the Informal Resolution Period. You agree to this process even though it may delay the arbitration of your claim. In the first stage, each side shall select 10 cases (20 cases total) to be filed in arbitration and resolved individually by different arbitrators…In the meantime, no other cases may be filed in arbitration, and the AAA shall not accept, assess or demand fees for, or administer arbitrations that are commenced in violation of this section. The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible…If the remaining cases are unable to be resolved after the conclusion of the first stage bellwether proceeding, each side shall select up to another 10 cases (20 cases total) to be filed in arbitration…During this second stage, no other cases may be filed in arbitration. If any claims remain after the second stage, the process will repeat until all claims are resolved through settlement or arbitration…If section 11.6 applies to a Notice, the statute of limitations applicable to the claims and relief set forth in that Notice shall be tolled from the beginning date of the Informal Resolution Period until that Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved. A court will have authority to enforce this section 11.6, including to enjoin

2023 Online Services Agreement, Ex. 4 to Schuessler Decl. at §11.6.  ECF No. 88-4.

Like the arbitration agreement in *MacClelland*, this provision is triggered by the filing of 25 or more similar claims by the same set of counsel and is permeated with unconscionability. *Id.* The agreement creates a cap on the number of arbitrations that can proceed, allowing only twenty claims to proceed individually at any one time. *Id.*  This cap on the number of arbitrations which may proceed significantly delays plaintiffs' rights to timely adjudicate their claims.  As set forth in the complaint, over 200 million Americans elected to file their tax returns electronically in 2022. Second Amended Complaint, ECF No. 36 at ¶ 70.  Granted, H&R Block is not responsible for all 200 million tax returns which were electronically filed, but they are responsible for a large share of the market.  Under the provisions of this arbitration agreement, if counsel for Mr. Hunt came to represent even a fraction of the potential claimants who agreed to H&R Block's OSA, the delay would be staggering.  For example, if Plaintiff's counsel came to represent only 5,000 individual claimants, and each arbitration that was allowed to proceed resolved within the 120-day period wished for by H&R Block, only 60 claims would be adjudicated per year.  With that math, it would take roughly eighty-three years to adjudicate each claim, due to the delay.  However, stats from the American Arbitration Associated show the average arbitration proceeding takes nearly seven months (roughly 212 days) to reach disposition which would delay the adjudication of claims even more drastically.  *See McClelland*, 609 F. Supp. 3d at 1040. Under either analysis, many of the potential claimants who may have a viable claim would die before their claims could ever be adjudicated in arbitration.  As the Ninth Circuit has recognized, delaying the ability of a party to seek adjudication of his claims "conflict[s] with one of the basic principles of our legal system---justice delayed is justice denied."  *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021).  Just as the court in *MacClelland* held requiring consumers who retain similar counsel to "wait months, more likely years before they can even submit a demand for arbitration" is one sided and overly favorable to the Defendant, the same result should follow here.  609 F.Supp.3d at 1041.  Mr. Hunt need not show that thousands of other plaintiffs have been adversely affected. *See*

1  *id.* "In assessing unconscionability, the Court must examine the validity of a contractual provision

2  as of the time [ ] the contract is made — it is a prospective analysis which does not require proof

3  that a particular plaintiff has already been adversely affected." (citations omitted.) *Id.*  He need

4  only show the provision was unconscionable at the time it was made, and here that unconscionable

5  delay is evident.

6          The unconscionability of this agreement doesn't end with a cap on the number of claims

7  which may proceed.  Rather, the bellwether process outlined in H&R Block's arbitration

8  agreement is also in direct conflict with the American Arbitration Association's Supplementary

9  Rules for Multiple Case Filings which, unlike the arbitration agreement, do not require a party to

10  wait a set amount of time before initiating a demand in arbitration, do not require cases to be tried

11  in tranches or waves, and allow for parties to opt out of global mediation. *See* Exhibit 3, American

12  Association's Supplementary Rules for Multiple Case Filings. Additionally, the provision is

13  unconscionable as it lacks mutuality, which is a "paramount" in assessing substantive

14  unconscionability.  *See MacClelland*, 609 F. Supp. 3d at 1042 (citing *Pokorny v. Quixtar*, 601

15  F.3d 987, 997 (9th Cir. 2010)).  Under this arbitration agreement, restrictions are placed on

16  plaintiffs' counsel with 25 or more claimants, but H&R Block is permitted to freely select the

17  same counsel to represent it in all of its arbitrations with no consequences or delays.  This lack of

18  mutuality is fundamentally detrimental to this provision.

19          Under this mass arbitration provision claimants with the same or similar counsel may not

20  file a demand for arbitration until their case is selected for the bellwether process and/or all other

21  bellwether cases pending in arbitration before them are resolved.  Taken to its logical extreme, if a

22  claimant is approaching his/her statute of limitations, this provision precludes that plaintiff from

23  filing a demand for arbitration and stopping the clock unless the claimant has previously complied

24  with the sixty-day delay of the arbitrary pre-arbitration administrative process.  In essence, failure

25  to comply with this notice would result in a claimant forfeiting his/her entire legal rights as it bars

26  a claimant from stopping the clock by filing a demand for arbitration.  Such a forfeiture of entire

27  legal rights has been deemed to be unconscionable and against public policy.  *See MacClelland*,

28  609 F.Supp.3d at 1042 (citing *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir.2009)).

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO
COMPEL ARBITRATION AND STAY LITIGATION

**5. H&R Block's Arbitration Agreement is so Permeated with Unconscionability it Must be Deemed Unenforceable as a Whole**

"If a court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable cause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). "If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." *Armendariz,* 24 Cal. 4th at 124. Put another way, if the contract is "permeated" with unconscionability, severance is not required and the entire contract can be deemed unenforceable. *See id.* The existence of a severability clause does not save an agreement permeated with unconscionability from being stricken in its entirety. *See MacClelland*, 609 F.Supp.3d at 1045. When a court is unable to cure unconscionability through severance or restriction, and it is not permitted to cure it through reformation, the entire agreement must be voided. *See Mills v. Facility Sols. Grp.,* 84 Cal. App. 5th 1035, 1065-66 (2022). If an arbitration agreement is permeated with unconscionable provisions which seek to impose an inferior and ineffective forum in which to adjudicate claims, severance should be denied, and the arbitration agreement should be stricken. *See id.*; *MacClelland*, 609 F.Supp.3d at 1046.

The arbitration agreement within H&R Block's OSA is so permeated with unconscionability it should be stricken in its entirety. "If the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event they are challenged successfully in court." *Id.* at 1046. Here, the presence of substantial and pervasive unconscionable provisions is direct evidence of H&R Block's intent to impose an inferior forum onto its consumers by creating a process by which adjudication of claims is so ineffective that the majority of claimants will not have their claims adjudicated in their lifetime and/or will be outright barred from filing a demand for arbitration to stop the statute of limitations time clock unless they comply with the arbitration

agreements' unconscionable pre-administrative notice requirement. This, combined with the arbitration agreement's clear failure to comply with the rules of the American Association of Arbitrators, along with the lack of mutuality regarding the parties' abilities to be represented by the same counsel or to amend their claims, should render this arbitration agreement void.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order denying H&R Block's Motion to Compel Arbitration.

Dated: March 7, 2024                 Respectfully Submitted,

*/s/ R. Brent Wisner*
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
Harrison E. James, Esq. (SBN:337733)
hjames@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

Christopher L. Coffin (*Admitted Pro Hac Vice*)
ccoffin@coffinlawllc.com
**Coffin Law, LLC**
1311 Ave. Ponce de Leon, Suite 504
San Juan, Puerto Rico 00907
Tel: (787) 961-9988

Jessica A. Reynolds (*Admitted Pro Hac Vice*)
jreynolds@pbclawfirm.com
**PENDLEY, BAUDIN & COFFIN, LLC**
24110 Eden Street
Plaquemine, LA 70764
Phone: (225) 687-6396
Fax: (225) 687-6398

*Attorneys for Plaintiff*

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO H&R BLOCK'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION

## CERTIFICATE OF SERVICE

I, hereby certify that on this 7th day of March, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ R. Brent Wisner*
R. Brent Wisner